IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| PEACH STATE ROOFING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KIRLIN BUILDERS, LLC, | ) | |
| *formerly known as* | ) | |
| John J. Kirlin Special Projects, LLC, and | ) | |
| BMH ENGINEERING, LLC. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | CIVIL ACT. NO. 1:15cv526-CSC |
| | | (WO) |
| KIRLIN BUILDERS, LLC, | ) | |
| | ) | |
| Counter Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PEACH STATE ROOFING, INC., | ) | |
| | ) | |
| Counter Defendant. | ) | |
| _____ | | |
| KIRLIN BUILDERS, LLC, | ) | |
| | ) | |
| Third Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| North America Specialty Ins. Co., | ) | |
| | ) | |
| Third Party Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

# I. INTRODUCTION

Plaintiff Peach State Roofing, Inc. ("Peach State" or "PSR") filed this action on July 22, 2015, against defendants Kirlin Builders, LLC ("Kirlin")[1] and BMH Engineering, LLC ("BMH")[2] alleging claims of anticipatory breach of contract and breach of contract, wrongful termination, promissory estoppel, quantum meruit, negligence, negligent misrepresentation, respondeat superior, suppression, deceit, non-disclosure and concealment of material facts.[3] Also before the court is Kirlin's counterclaim alleging breach of contract, or in the alternative, quantum meruit against Peach State and North American Specialty Insurance Co., ("NAS"), Peach State's bonding company.

The court has jurisdiction over these claims pursuant to its diversity jurisdiction and will apply Maryland law due to choice of law provisions in the contract documents. *See* 28 U.S.C. § 1332(a)(1). Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties consented to the United States Magistrate Judge conducting all proceedings in

---

[1] Kirlin was previously known as John J. Kirlin Special Projects, LLC ("JJKSP") but during the pendency of this litigation, changed its name. For ease of reference, the court refers to this defendant as Kirlin.

[2] During the trial of this matter, the court granted BMH's motion for judgment as a matter of law. Consequently, the claims of promissory estoppel, quantum meruit, negligence, negligent misrepresentation against BMH were dismissed. Additionally, because BMH was dismissed, the plaintiff's claim of respondeat superior against Kirlin is also due to be dismissed.

[3] The operative pleading in this case is the plaintiff's amended complaint filed on August 19, 2015.

this case and ordering the entry of final judgment. A bench trial was held in December 2016, and the court now makes the following findings of fact and conclusions of law.[4]

## II. FINDINGS OF FACT[5]

This is a tale of two contracts. The United States Army Corps of Engineers ("the Government") awarded Kirlin the Prime Contract to act as Prime Contractor on a roofing project at Lyster Army Health Clinic, Fort Rucker, Alabama. In conjunction with the Prime Contract[6] with the Government, Kirlin awarded Peach State Roofing a Subcontract for it to act as the Roofing Subcontractor on the project. Unfortunately, the Subcontract drafted by Kirlin is inconsistent with some requirements under the Prime Contract. For example, the Prime Contract called for a roof that met a FMI -120 wind uplift requirement. The Subcontract called for a roof that met a 120 mph wind zone requirement. The distinction is significant because a wind uplift requirement refers to uplift pressure and the forces underneath the roof while a wind zone requirement refers to wind over the top of the roof. (Tr. Trans. at I-205-06). The other significant difference concerns insulation. The Prime Contract referenced construction standard Section 07 22 00 which in part requires installation two layers of insulation. As will be seen, the

---

[4] Also pending before the court is Kirlin's motion for summary judgment. (Doc. # 62). The court carried the motion for summary judgment with the bench trial, and that motion is now due to be denied as moot.

[5] While many of the facts are largely undisputed, including stipulations set forth in the pretrial conference order, it is the import of those facts that governs the resolution of the remaining issues in this case. *See* FN 2, *supra*.

[6] In an effort to differentiate between the contracts in this case, the court refers to Kirlin's contract with the Government as the Prime Contract and will refer to Kirlin's contract with Peach State as the Subcontract.

Subcontract does not contain that requirement.  The conflicts caused by these fundamental differences as well as the manner in which Kirlin administered the contract form the basis of the disputes at issue in this case.

Furthermore, much of the difficulty in this case began with a lack of precision in the terms used in the contracts.  The contracts are a labyrinth of attachments and references which would confound even lovers of the impossible constructions art of M.C Escher.[7]  Nonetheless, the court has painstakingly reviewed the salient documents submitted by the parties, and now attempts to set forth the facts in a coherent fashion. It does so as much as possible in chronological order.

## A.    Prime Contract between the Government and Kirlin

On January 27, 2014, the Government requested Kirlin and six other companies to offer proposals to replace and repair the roof at Lyster Army Health Clinic in Fort Rucker, Alabama.  (Tr. Ex. 1).[8]  The Government requested the companies to submit a "Firm-Fixed Price (FFP) proposal for Design and Repair/Renewal/Construction, as detailed in the enclosed Scope of Work."  (*Id*. at 1).  The Government's Scope of Work constitutes the project documents that describe the work to be completed in detail and includes all the Government's specifications and requirements for the project.  Attached to the Request for Proposal was a Scope of Work dated January 24, 2014, and Attachments 2 and 1.  (*Id*.)  Proposals were due by February 27, 2014.  (*Id*.)  The

---

[7]*See* http://www.mcescher.com/.
[8]  After the bench trial, the court directed the parties to submit a single consolidated set of exhibits. For ease of reference, the court refers to the exhibits in the consolidated set.

documents contain the crucial project specifications related to the PVC membrane roofing system and insulation for the wind uplifts and wind zone requirements of the building.

On February 28, 2014, the Government amended its Scope of Work.[9] Section 2.1.3 of the Scope of Work as amended outlines the work to be performed under a contract with the Government.

> Repair/Construction Action: Remove all existing and install new tapered roof insulation system to provide positive drainage to roof drains and scuppers. Insulation shall provide a minimum R=20 thermal resistance. On top of new insulation, install a new single ply PVC membrane roof to comply with requirements for a 20 year No Dollar Limit Warranty. New metal coping and re-flashing of scuppers will be required. Extend existing plumbing vents to a minimum of 8" above finished roof surface. Provide new flashing devices, compatible with PVC roofing system, at these and other roof penetrations.

(Tr. Ex. 2 at 1).

Thus, the Scope of Work as amended required a minimum R-20 valued thermal insulation under a PVC membrane roof but did not explicitly require that the insulation be installed in two layers. The Scope of Work as amended also does not reference roofing construction standard Section 07 22 00.

Proposals for the contract were due to the Government by March 17, 2014. (Tr. Ex. 3). An extension was granted to allow proposals to be submitted by March 20, 2014. (*Id*. at 7).

---

[9] The Scope of Work as amended made some changes to the original Scope of Work but did not alter any of the sections material to this dispute. Thus, the court will reference the operable document as the Scope of Work as amended.

On April 24, 2014, the Government offered the Prime Contract for the project to Kirlin at a price of $3,436,024.85. (Tr. Ex. 6). Kirlin accepted the Government's offer to contract as the prime contractor on the roofing project on May 6, 2014. The Prime Contract between the Government and Kirlin required Kirlin to replace the roof at Fort Rucker Lyster Army Health Clinic "in accordance with the attached scope of work dated 24 January 2014."[10] (*Id*.). In addition, Kirlin's proposal was "incorporated" in the contract "and made a part of this task order." (*Id*.)

The Scope of Work as amended delineates the Task Order as "Roof Replacement" and describes the project as follows.

> 2.1 Project Description: The objective of this Project is for the Contractor to provide all labor, materials and equipment necessary to repair by replacement the roofing system at Lyster Army Health Clinic, Ft. Rucker, AL, in accordance with all Federal, State, and Installation codes and laws, to include preparation of a Type 3 Work Plan/design as discussed below. The new roof shall be designed using a PVC membrane (72 mil minimum) having the latest in energy efficient systems with pathways to all roof mounted equipment in compliance with regulations/standards, and meet the current health and standard safety requirements. All work in conjunction with this Task order will provide a complete and functional roofing system.

(*Id*. at 3).

In addition, under the Prime Contract, Kirlin was obligated to develop a site survey and report, and was responsible for preparing "design documents."[11]

> Section 2.1.2. The contractor shall prepare design documents to clearly describe their plan of work for completing the requirements of this project. . . . The Contractor shall base his design per the attached PVC

---

[10] The Scope of Work was amended on February 28, 2014.

[11] The use of this term "design documents" becomes important because this language is used in Kirlin's contract with the Government as well as in the Subcontract between Kirlin and Peach State.

Specifications (Attachment 1 & 2) Attachment 1 (2009 Specification) should be used as an example of the existing quality standard for PVC roofs and Attachment 2 (2013 Specification) should be finalized as a part of the final work plan deliverable. **The SOW shall supersede any conflicts between both attached specifications and Attachment 2 shall supersede any conflicts in Attachment 1.**

(*Id*. at 4) (emphasis added)

The Scope of Work as amended specifies the insulation required by the contract.

Section 2.1.3.  Insulation shall provide a minimum R=20 thermal resistance.  On top of new insulation, install a new single ply PVC membrane roof to comply with requirements for a 20 year No Dollar Limit Warranty.

(*Id*. at 6).

The Prime Contract obligated Kirlin to provide to the Government the following work plan documents[12] as deliverables: 35% Work Plan/Design Documents; 65% Work Plan/Design Documents; 100% Work Plan/Design Documents - Unrevised; and 100% Work Plan/Design Documents - Issued for Repair.  (*Id*. at 7).   In other words, Kirlin was responsible for creating and providing these documents to the Government pursuant to its contract with the Government.

The Scope of Work as amended was not the only document to which Kirlin was obligated to adhere.  It was incumbent on Kirlin to understand its responsibilities under the Prime Contract and to ensure that its subcontractor, Peach State, provided a roofing

---

[12]These "work plan documents" are not defined in the Prime Contract but are used by Kirlin in its interactions with the Government as well as its interactions with Peach State.

system that met Kirlin's obligations under Prime Contract. Attachments 1 & 2, entitled

PVC Roofing Spec, include sections related to Roof Insulation. (*Id*. at 10).

> Insulation system and facer material shall be compatible with membrane
> application specified and be approved and supplied by the PVC membrane
> roof manufacturer [and as specified in Section 07 22 00 ROOF AND
> DECK INSULATION].

(Att. 2 at 10, Section 2.1.9; Att. 1 at 10, Section 2.1.9)

Attachment 2 requires the roof membrane manufacturer to accept the "insulation

and other products and accessories to be provided by and warranted under the full system

guarantee of the roof membrane manufacturer." (*Id*. at 10).

Pursuant to its Prime Contract with the Government, Kirlin was responsible for

examining and verifying that the roof was installed in compliance with the Scope of

Work as amended. *See Id*. at 12-14, Section 3.2, Section 3.3.2, Section 3.3.3.

> Ensure that the following conditions exist prior to application of roofing
> materials:
>
> > j. Insulation boards are installed smoothly and evenly, and
> > are not broken, cracked, or curled. There are no gaps in
> > insulation board joints exceeding 6 mm 1/4 inch in width.
> > Insulation is **attached** as specified in Section 07 22 00 ROOF
> > AND DECK INSULATION. Insulation is being roofed over
> > on the same day the insulation is installed.

(*Id*. at 12-13, Section 3.2) (emphasis added)

Section 07 22 00 is a government construction standard that sets forth the

requirements for insulation on roofs and decking on government buildings.[13] In addition

---

[13]Although Section 07 22 00 is referenced in Attachments 1 and 2, the specification is not included
with Scope of Work as amended or the Attachments.

to stating that insulation should be applied in "two layers when total required thickness of insulation exceed 1/2 inch," Section 07 22 00 also describes quality control requirements, surface preparation, requisite fastening patterns, and types and thickness of insulation. (Tr. Ex. 11 at 69-75). Thus, section 07 22 00 requires much more than just two layers of insulation. Notably, the Prime Contract specifies that insulation be "*attached as specified in Section 07 22 00.*" (*Id.* at 12-13, Section 3.2). Section 07 22 00 requires the use of mechanical penetrating fasteners that are

> [f]ush-driven through flat round or hexagonal steel or plastic plates. Steel plates shall be zinc-coated, flat round not less than 1 3/8 inch diameter or hexagonal not less than 28 gage. Plastic plates shall be high-density, molded thermoplastic with smooth top surface, reinforcing ribs and not less than 3 inches in diameter. Fastener head shall recess fully into the plastic plate after it is driven. Plates shall be formed to prevent dishing. Do not use bell-or cup-shaped plates. Fasteners shall conform to insulation manufacturer's recommendations except that holding power, when driven, shall be not less than 120 pounds each in steel deck. Fasteners for steel or concrete decks shall conform to FM APP GUIDE for Class I roof deck construction, and shall be spaced to withstand an uplift pressure of 120 pounds per square feet.

(Tr. Ex. 11 at 72).

Finally, Kirlin also agreed to ensure that the PVC membrane was installed free from wrinkles and fishmouths.[14] (*Id.* at 13-14, Section 3.3.2, Section 3.3.3, Section 3.3.4).

## B.    Subcontract between Kirlin and Peach State

---

[14] The parties do not explain what the term "fishmouth" means.

In conjunction with its submission of a proposal to the Government, Kirlin solicited bids from roofing companies to perform the work that would be required for the roofing project at Fort Rucker if Kirlin received the Prime Contract. Prior to submitting its formal proposal, Peach State engaged in an email exchange with Kirlin discussing the specifications of the roofing project. (Tr. Ex. 5). On March 18, 2014, Kirlin asked Peach State to confirm that it understood "that [Kirlin] [is] obligated to the Government's Scope of Work and it's (sic) attachments." (*Id*.) Kirlin advised Peach State that specifications with the Scope of Work were "rarely included" so Peach State needed to "read those documents." (*Id*.) After a further series of emails, on March 27, 2014, Peach State submitted a proposal to Kirlin to act as the roofing subcontractor to replace and repair the roof at Fort Rucker. (Tr. Ex. 5 at 7). Peach State's proposal included the following

- Remove existing roof system down to metal deck and properly dispose.
- **Furnish and install 130,500 sf of 3.5", R-20 (1 layer) polyiso insulation over sloped metal deck, mechanically fastened**.
- **Furnish and install 90,500 SF of 3.5", R-20 (1 layer) polyiso insulation over sloped concrete deck** . . .
- Furnish and install 72mil PVC membrane, mechanically attached and fully adhered over concrete.

\*     \*     \*

(*Id*.) (emphasis added).

Peach State proposed completing the work for $2,107,315.00 and included a performance bond costing $32,000.00. (*Id*.) Although the Subcontract is dated May 19, 2014, Kirlin awarded Peach State the Subcontract for the roofing replacement project on

May 6, 2014.[15]  (Tr. Ex. 7 at 24).  Peach State contracted to "[p]rovide and install new roof work in strict accordance with the Contract Documents."  (*Id*. at 2).  The Subcontract then specifically listed those documents included in the Subcontract:

- the 5 page contract document,
- all exhibits and and attachments to the Subcontract,
- agreement between the Owner and the General Contractor,
- Attachments A and B and
- a Davis Bacon Wage Determination.[16]

(*Id*.)

The Subcontract between Peach State and Kirlin states that Peach State would "furnish and install new R-20 minimum polyiso insulation" (*id*. at 10) which conformed to the Government's Scope of Work as amended.  The Scope of Work as amended references R-20 insulation but does not specify one or two layers of insulation.[17]

In addition, Attachment A to the Subcontract defines "PSR Scope of Work."

- Furnish and install a complete new roofing system for Lyster Army Health Clinic to include demolition.  All work will be conducted per work plan documents, Government scope of work, and its Attachments 1 & 2.  Perform all Roofing work associated with the work plan documents, including, but not limited to, Division 07 specifications.
  
  \*  \*  \*
- **Furnish and install new R-20 minimum polyiso insulation** over metal deck, mechanically fastened

---

[15]  The Subcontract is dated May 19, 2014.  Peach State signed the document on July 2, 2014 and Kirlin signed it on September 4, 2014.  The parties presented no explanation for the delay in executing the Subcontract.

[16]  Also mentioned as a contract document is "[t]he agreement between the General Contractor and JJK [Kirlin] (if JJK [Kirlin] is not the General Contractor)."  (*Id*.)  Because Kirlin was the General Contractor, this provision is inapplicable.

[17]  Again the Attachments to the Government's Scope of Work as amended reference Section 07 22 00, but as already mentioned that section involves significantly more than just two layers of insulation.  (Tr. Ex. 11 at 69).  Moreover, Peach State's proposal which forms the basis of the Subcontract specifically calls for "R=20 (1 layer) polyiso insulation."  (Tr. Ex. 5 at 7).

- **Furnish and install new R-20 minimum polyiso insulation** over concrete deck, fully adhered with low VOC, 2 part polyurethane adhesive.

- Furnish and install minimum 72mil PVC membrane, mechanically attached over metal and fully adhered over concrete.

- **All systems meet 120mph wind zone requirements per final work plan.**[18]

(*Id*. at 10) (emphasis added)

Division 07 specifications refer to Government building construction standards that relate to Thermal and Moisture Protection and include much more than just roof and deck insulation. (Tr. Ex. 11 at 31; Def's Tr. Ex. 3 at 1-2). Included in Division 07 is Section 07 22 00 but it differs from Section 07 22 00 contained in Kirlin's Work Plans. For example, in Division 07, Section 07 22 00, "[r]oof insulation should be specified by thermal resistance (R value) necessary to obtain required overall thermal transmittance (U value) need to satisfy design criteria for particular type of facility." (Def's Tr. Ex. 3 at 12, Section 2.1.1). In addition, Division 07 discusses polyisocyanurate insulation which was to be installed on the roof. *See* Def's Tr. Ex. 11 at 15.

> Where polyisocyanurate foam board insulation is provided, install 13 mm 1/2 inch thick wood fiberboard, glass mat gypsum, or 19 mm 3/4 inch thick expanded perlite board insulation over top surface of foam board insulation. Stagger joints of insulation with respect to foam board insulation below.

(Def's Tr. Ex. 3 at 26, Section 3.4.4.1) (footnote added)

This section does not specify two layers of insulation. Attachment A to Peach State's Subcontract with Kirlin required Peach State to "[p]erform all Roofing work

---

[18] At this point in time, there was no final work plan in place.

associated with the work plan documents, including, but not limited to, **Division 07 specifications**." (Tr. Ex. 7at 10) (emphasis added).

Thus, to the extent that the Subcontract references insulation, it provides that Peach State will "[f]urnish and install new R-20 polyiso insulation" in accordance with Division 07 specifications that meets the 120 mph wind zone requirements for the building. (*Id*.)

Kirlin places great reliance on the Subcontract's "Flow Down" provision which obligated Peach State to Kirlin "in the same way [Kirlin] is [obligated] to the [Government.]"[19] (*Id*. at 2). However, the Flow Down provision includes an exception. "Except that this Subcontract shall govern any inconsistent provision in the Contract Documents." (*Id*.)

Finally, the Subcontract contains the following provision.

> SUBCONTRACTOR RECOGNIZES THE DESIGN/BUILD NATURE OF THE PROJECT AND UNDERSTANDS THAT THE SCOPE OF WORK INDICATES THE MAIN WORK TO BE ACCOMPLISHED AND THAT ALL DETAILS AND SPECIFICS ARE **NOT** NECESSARILY SHOWN OR SPECIFIED. SHOULD ADDITIONAL ARCHITECTURAL OR ENGINEERING WORK BE REQUIRED BY THE SUBCONTRACTOR TO CONSTRUCT THE PROJECT THAT COST WILL BE BORNE BY THE SUBCONTRACTOR. **NO ADDITIONAL DESIGN DOCUMENTS WILL BE FURNISHED BY JOHN J. KIRLIN SPECIAL PROJECTS, LLC**. THERE WILL BE NO CHANGE ORDERS UNLESS NEW AREAS AND/OR WORK ARE ADDED BY THE CUSTOMER.

(*Id*. at 11) (emphasis added).

And, Attachment A to the Subcontract further advised Peach State that "[n]o Additional Design Documents will be furnished," and "[t]here will be no change orders

---

[19] The court will have more to say about the effect of this provision later.

unless new areas and/or work are added by the customer." (*Id.* at 11).  Attachment B lists the Contract Drawings and Specifications applicable to the project.  The Contract Drawing that is listed is Task Order No. 0021 which is dated April 24, 2014 but that document is not included or attached.[20]  (*Id.* at 20).  Attachment C to the Subcontract is a list of Government forms and federal contracting clauses that are incorporated in the Subcontract. (*Id.* at 28).

> **[C]LAUSES OF THE CONTRACT <u>LISTED ABOVE</u> ARE INCORPORATED BY REFERENCE AND ARE DEEMED TO BE INSERTED IN THEIR ENTIRETY, AND TAKE PRECEDENCE OVER ALL OTHER TERMS AND CONDITIONS, AND ARE INCLUDED IN THE SUBCONTRACT AGREEMENT/PURCHASE ORDER.**

(*Id.* at 29) (emphasis in the original)

The dispute clause upon which Kirlin relies in this case, FAR52.233-1, is not listed as one of the federal contract clauses that is incorporated in the Subcontract.  (*Id.* at 28-29).

### C.     Kirlin's Work Plans

To fulfill its obligation to the Government under the Prime Contract, Kirlin was required to create a 35% Work Plan, a 65% Work Plan and a 100% Work Plan.  The 35% Work Plan was dated July 2014 (Def's Ex. 11); the 65% Work Plan was dated 6 October 2014 (Def's Ex. 13); the 100% Work Plan - unrevised[21]; and the 100% Work Plan - Issued for Repair was dated 5 February 2015 (Def's Tr. Ex. 18).  For the purpose of the issues in

---

[20]   Task Order No. 0021 was introduced at trial and refers to the project as a Type K Repair and Renovation project.  (Tr. Ex. 6 at 2).

[21]   No date was provided for the 100% unrevised Work Plan.

this case, the relevant provisions of the Work Plans are the same in all four plans. Consequently, the court begins by describing in detail the 35% Work Plan because the other Work Plans were built upon this foundational document.

The 35% Work Plan initially describes the roof replacement project as "a fully-adhered, single-ply 72-mil minimum PVC-membrane system with a 20-year No-Dollar Limit (NDL) warranty and **will meet FM I-120 wind uplift criteria**." (Def's Tr. Ex. at 3) (emphasis added). This wind uplift requirement is different from a 120 mph wind zone requirement. The 35% Work Plan describes the insulation as follows.

> Once the deck is ready for the new roof, the insulation will be installed to provide a minimum insulating value of R-20 in accordance with Table C402.2 of the International Energy Conservation Code . . . . Roof insulation will be installed with a fully-adhered process using a low-rise foam and adhesive on the concrete deck, or mechanical fasteners on the metal decking.

(*Id*. at 8; Def's Ex. 13 at 6).

In the 35% Work Plan, Kirlin stated that "[n]ew rigid insulation will be installed and inspected to conform to the **specified R value and wind uplift criteria**." (*Id*. at 9) (emphasis added). The 35% Work Plan created by Kirlin does not explicitly require two layers of insulation.[22] *See Id*. at 4, 8, 9, and 15.

> General notes on construction document 13. Roof insulation shall be rigid poly-isocyanurate board with thickness as required to achieve an average R-value of R-20. **Attachment shall conform to FM I-120**. Refer to specifications for additional material and installation requirements.

(*Id*. at 15) (emphasis added).

---

[22] On page 31 of the 35% Work Plan, Kirlin references Construction Standards which includes Section 07 22 00, Roof and Deck Insulation. (*Id*. at 31).

Through its Architect or Engineer, Kirlin had the responsibility and obligation to review submittals to ensure that the submittals complied with the Prime Contract.

> When submittals are provided by a Subcontractor, *the Prime Contractor is to prepare, review and stamp with Contractor's approval all submittals prior to submitting for Government approval.*

(*Id*. at 38) (emphasis added).

The 35% Work Plan gives the Government Contracting Officer the authority to require Kirlin as the Prime Contractor to "resubmit any item found not to comply with the contract." (*Id*. at 43).

> This does not relieve the Contractor from the obligation to furnish material conforming to the plans and specifications; will not prevent the Contracting Officer from requiring removal and replacement of nonconforming material incorporated in the work plan. . . .

(*Id*).

The 35% Work Plan also includes the Section 07 22 00 Roof and Deck Insulation "to the extent referenced." (*Id*. at 69). The referenced specification relates to "thermal insulation above the roof deck with an R value of 20 and **attach to structural deck to conform with an FM I-120 wind uplift rating.**" (*Id*. at 70) (emphasis added). It describes the insulation type as a board "compatible with membrane application" and outlines the requisite insulation thickness. (*Id*. at 71-72).

> As necessary to provide a thermal resistance (R value) of 20 for average thickness of tapered system. Thickness shall be based on the "R" value for aged insulation. Installation over steel decks shall satisfy both specified R value and minimum thickness for width of rib opening recommended in insulation manufacturer's published literature.

(*Id*. at 72).

In only a single sentence on insulation application does Section 07 22 00 mention two layers of insulation. "**Apply insulation** in two layers with staggered joints when the total required thickness of insulation exceeds ½ inch." (*Id*. at 73) (emphasis added).

Two provisions of the 35% Work Plan relate to Kirlin's obligations to inspect and approve all work on the roof. Kirlin was required to "establish and maintain an inspection procedure to assure compliance of the installed roof insulation with the contract requirements. Any work found not to be in compliance with the contract shall be promptly removed and replaced or corrected in an approved manner." (*Id*. at 74). The 35% Work Plan also contemplated that during the roof replacement, Kirlin would verify that the PVC membrane and insulation were properly adhered, secured and free of "ridges, wrinkles, kinks, and fishmouths." (*Id*. at 93).

Finally, the 35% Work Plan specified that the roofing materials would be provided by Carlisle Manufacturing. The 35% Work Plan included Carlisle's Roof Product Data on its Roof Membrane and System. (*Id*. at 141). The 35% Work Plan referenced Carlisle Sure-Flex PVC 80-mil Membrane with Carlisle Insulation included. (*Id*. at 142-44). Carlisle's materials indicated that "[a]ll equipment will be installed in accordance with manufacturer's instructions and recommendations." (*Id*. at 152).

The 65% Work Plan included the Carlisle Product Information and again stated that the roof would be "installed in accordance with the manufacturer's installation instructions." (Def's Ex. 13 at 186). In response to the 65% Work Plan, the Government

requested that Peach State provide "installer's certification from roof membrane manufacturer." (*Id*. at 193-95). Carlisle submitted the requested certification to Kirlin which stated that Peach State Roofing was "a Carlisle Authorized Applicator." (*Id*. at 197).

On March 4, 2015, Kirlin's 100% Work Plan was approved by the Government. All the Work Plans included Carlisle's Product Data and clearly contemplated that Peach State would install a Carlisle Sure-Flex PVC 80-mil Membrane Roofing system including insulation.

### D. Pre-construction Communications between Kirlin and Peach State

On July 11, 2014, Kirlin sent an email to Peach State and Hughes, the plumbing subcontractor, notifying them that "[t]he 35% Work Plan for the 778021 Fort Rucker Roof Replacement work project [was] online for review . . ." (Tr. Ex. 9). However, nobody at Peach State reviewed the 35% Work Plan because Peach State understood that the 35% Work Plan was a document between Kirlin and the Government. (Tr. Trans. at I-25-26, I-82).

For reasons that were not at all explained at trial, in November 2014, Kirlin and Peach State began an email discussion about the use of Carlisle products.[23] On November 12, 2014, Larry Kelly, who works for Peach State, responded to an email[24] from Ryan

---

[23] Because Carlisle's product data was attached to the 35% and 65% Work Plans, and because the parties did not explain how the email conversation got started, *see* FN 23, *infra*, the court is left simply entering the fray caused by the emails.

[24] At trial, the parties relied heavily on emails as evidence. Unfortunately, the lack of attention to detail in this regard created difficulty because some of the emails lack context and are difficult to follow. It also highlights the difficulty with e-mails - when communicating almost exclusively through email, Kirlin and Peach State did not develop a working relationship that would have evolved if they had talked with each other.

Johnson, who worked for Kirlin, which questioned the use of Carlisle's roofing products. (Tr. Ex. 10 at 5). Johnson asked Kelly "how did we end up with Carlisle product data?" (*Id*.). Frankly, Kelly's response to Johnson is baffling since Kelly worked for Peach State, and Peach State recommended using Carlisle products. Kelly responded "No idea!? We just want to run a smooth efficient project for all of us." (*Id*. at 4) Jeremy Koczenasz, Kirlin's project manager, responded to Kelly at Peach State with the following:

> Carlisle was requested by Peach State early in the design process. At the 35% Work Plan, a question on phasing was asked by the facility and Peach State provided the attached letter and detail. We also provided Carlisle details and product data as that is whom Peach State requested to use. The Work Plan had Carlisle product data in it so no submittal is required as it is part of the design documents.

(*Id*. at 3).

Kirlin also confirmed the use of Carlisle products. "Proceed with Carlisle. Carlisle product data was approved within the 35% Work Plan that PSR was given an opportunity to review." (*Id*.)

Kelly then sought confirmation that Peach State was permitted to order "the Carlisle 3.5" polyisocyanurate R=20 and the Carlisle 72 mil or greater PVC." (*Id*.) Kirlin replied that it was Peach State's decision as to when it ordered the material but went on to say

>  [c]oncerning the material to be used, if it is in the 35% Work Plan, it is approved to be ordered. Any materials such as insulation that were not in the work plan will need to be submitted for review and approval before they are ordered.

(*Id*.)

Peach State also asked for the credentials to log in and view the 35% Work Plan which Kirlin provided. (*Id*. at 2). On November 14, 2014, Kirlin forwarded to Peach State the 65% Work Plan. (*Id*. at 1). Peach State's project manager James Grant did not review the 65% Work Plan because he was relying on Kirlin's representation that the Carlisle product had been approved in the 35% Work Plan. (Tr. Trans. at I-28-29). In other words, the email exchanges set out above related only to the use of Carlisle products and no other aspects of the Work Plans.

At some point,[25] Peach State submitted a proposal to Kirlin and its engineering firm, BMH Engineering, to use Carlisle Sure-Flex[TM] Flashing, insulation and other materials. (*Id*. at I-29). On December 12, 2014, Kirlin rejected Peach State's submittal because it did not conform to the requirements of the contract.[26] (Tr. Ex. 11). Written on the documentation provided by Peach State to Kirlin are the following instructions:

- Provide Intent to Warrant Letter w/20 Yr NDL

- Provide FM Approved Fastening Pattern conforming with **120 MPH Wind Zone**

- Provide Proof of Conformance with FM 4470 Per Spec Section 07 54 19-2.1.5.1

- Provide 80-mil Sure-Flex PVC

- 80-mils - Provide .096" Per 2.1.8 Sect. 07 54 19

---

[25] This is another instance where the parties failed to provide pertinent information to the court. At no point did any witness testify as to when Peach State submitted its first proposal to Kirlin that was subsequently rejected.

[26] It is undisputed that the 35% and 65% work plans were available to Peach State prior to their submittal to Kirlin. (Tr. Trans. at I-129). It is also undisputed that the Carlisle product data was included in both work plans, and Peach State did not use or rely on the work plans to develop their proposal to Kirlin and BMH. (*Id*. at I-129-30).

(Tr. Ex. 11) (emphasis added)

In addition, the documentation contained a page describing Carlisle's HP-H Polyiso Insulation. (*Id*. at 13). To achieve the R-20 thermal value, the requisite thickness of the insulation is 3.50" and is circled in red. (*Id*.) Carlisle's product data plainly demonstrates that Peach State was proposing a single 3.5" layer insulation. (*Id*).

Peach State amended its submittal, and on February 18, 2015, BMH Engineering on behalf of Kirlin, stamped its approval on Peach State's submittal. (Tr. Ex. 12 at 3).

Submittal No. 778021 has been reviewed by BMH Engineering, LLC.

✔ **Conformed exceptions noted**

"to the Standards required by the Work Plan. The Subcontractor is responsible to coordinate work with other trades and ensure adequate quantity(s) to meet the functional intent of the Facility Work Plan"

(Tr. Ex. 12 at 3) (emphasis added).

Specifically, the noted exceptions were the use of 80-mil PVC membrane[27] and 3.50 HP-H Polyiso thermal value insulation. (*Id*. at 3 & 28). Peach State also provided a warranty letter from Carlisle and a fastening pattern as requested by BMH. (*Id*. at 4 & 5-9). In Carslisle's letter, which is included in the submittal that was approved by BMH, Carlisle addressed the uplift and wind zone requirements.

Additionally, the proposed systems achieve an **FM I-90 uplift rating** meeting IBC/ASCE 7 design requirements. The uplift rating meets the design requirements based on a 50' tall building located in an ACSE 7 **120mph wind zone**.

---

[27]Because Carlisle did not have a 72-mil PVC membrane, Kirlin requested Peach State use Carlisle's 80-mil PVC membrane which Peach State agreed to do. (Tr. Trans. at I-33).

(*Id*. at 4) (emphasis added).

Carlisle's letter also reiterates that Peach State would install "a 3.5" thick Carlisle HP-H Polyisocyanurate Insulation mechanically fastened" and "adhered to the deck." (*Id*.) On February 18, 2015, Kirlin emailed to the Government Peach State's approved submission with exceptions noted. (*Id*. at 1). Consequently, based on the approval from BMH Engineering on behalf of Kirlin, Peach State was prepared to

> [i]nstall 3.5-inch-thick Carlisle insulation mechanically fastened to the steel deck. Eight fasteners in the field, 20 fasteners in the perimeter – at the perimeter, and 32 in the corners for the steel deck area.
>
> And then it specifies, for the three-and-a-half-inch insulation, the bead spacing for the two-part polyurethane adhesive that's used to adhere it to the concrete deck. And then all of this is going to be covered by an 80-mil membrane.

(Tr. Trans. at I-37).

Peach State's proposal to Kirlin to secure the Subcontract and its' submittals for approval to Kirlin and BMH Engineering all contemplated a single layer of 3.5 inch insulation suitable to meet the 120 mph wind zone requirement. Kirlin approved Peach State's second submittal noting that it "conforms with exceptions noted." (Tr. Ex. 12). Unquestionably, Peach State's proposal, Subcontract and submittal are inconsistent with the Government's requirements and Kirlin's work plans. For example, Kirlin's work plans called for R-20 value insulation with "**attachment** of the roof conforming to a FM I-120 wind **uplift**" while Peach State's Scope of Work as defined by the Subcontract required Peach State to "[f]urnish and install **new R-20 minimum polyiso insulation**" and the roof

must **"meet 120mph wind zone** requirements." (*Compare* Def's Ex. 13 at 70 *to* Tr. Ex. 5 at 10)(emphasis added). Nonetheless, BMH approved Peach State's submittal to replace the roof with R-20 polyiso insulation that meets a FM I-90 wind uplift rating for a building in a 120 mph wind zone requirement. BMH's approval of Peach State's submittal should have put Kirlin on notice that Peach State's proposal and submittal, coupled with the Subcontract, differed from Kirlin's obligations to the Government under the Prime Contract. It is obvious that at this time, Kirlin did not recognize, understand or appreciate the differences. After Kirlin forwarded Peach State's submittal to the Government representative, there is no evidence in the record that the Government had any concerns or questions about the insulation or the uplift or wind zone requirements.

Also, on February 18, 2015, Kirlin forwarded to Peach State by email roof drawings and government construction standards. Kirlin's email to Peach State in its entirety read: "Please see attached." (Tr. Ex. 14). Jim Grant, Peach State's project manager, testified that he received these documents from Kirlin because he had previously not received any "official roof drawings." (Tr. Trans. at I-41). However, when Grant looked at the documents to find the roofing drawings none were included in the attachment to the email. (*Id*. at I-42).

At trial, Kirlin suggested that this document was the 100% Work Plan. (Tr. Trans. at II-13-14). But as evidenced below by the court's colloquy with Attorney Patin, following his examination of a witness, the attachments to the email would not have notified any reasonable person that the attachments contained the 100% Work Plan.

Q:      And Defendant's Ex. 17 contains an email from Jeffrey Rhodes to Jim Grant forwarding the 100 percent work plan.  Do you recall that now?

A:      You're referencing a 100 work plan, but nowhere does that state that this is a 100 percent work plan.

Q:      Well, do you recall testifying in your deposition that in your deposition that what Mr. Rhodes forwarded to Mr. Grant was the same thing that was forwarded to you by Mr. Brock in May of -- June of 2015?

A.      What Jim [sic] Brock -- what he forwarded to me at the later date was specified as a cover page that it was a 100 percent work plan. All this states here is it's construction standards.  It never states anywhere in here that it's a 100 percent work plan.

    Q.      Did you ever look at what was sent to Mr. Rhodes?

    A.      No, I did not.

    Q.      Were you aware of Mr. Rhodes being sent this?

    A.      No, I was not.

    Q.      The first time you were aware of this email was the day before your deposition; correct?

    A.      I -- I -- yes, I saw it in preparation for my deposition.  Yes.

(Brief pause)

Q. Okay. I'm now going to turn to --

    THE COURT:  Mr. Patin, before you move on –

    MR. PATIN:  Yes, sir.

    THE COURT:  – I'm confused about the attachment in the sense of, what is it?  I mean, it says Construction Standards.  There's nothing in here to indicate, as you suggested to the witness, that this is the 100 percent work plan.  So how would anyone know that?

MR. PATIN:  They'd have to open the document and –

THE COURT:  Open what document?  I am not talking about the email.  I am talking about the attachment itself.  It doesn't say 100 percent work plan.  It says Construction Standards.

MR. PATIN:  Yes, Your Honor.  I understand.  If you went to the construction standards, at the bottom of the page, it would have a February 5, 2015, date.  That's the same as the100 percent work plan.

THE COURT:  So?  How would I know, if I were Mr. Grant out in the field up on a roof, that this was a 100 percent work plan?

MR. PATIN:  You would open up the document and read it and look at it.

THE COURT:  Show me in this document where it says it is the 100 percent work plan.

MR. PATIN:  The email does not say a 100 percent work plan, Your Honor.

THE COURT:  And nor does the document.  I want you to explain to me how a normal human being could understand that this is the 100 percent work plan by something other than, well, its got the same date. I mean, that's absurd.  There are thousands of documents that have the same date.

*     *     *

THE COURT:  So I'm just asking for a simple explanation of how a normal human being, especially someone who's out in the field working under field conditions, would get this and understand that this is something he ought to review especially  – well, I won't say it that way yet.

MR. PATIN:  Well, Your Honor, they're not working in the field on February 18th.  Mr. Grant is still in the office.  And all I can tell you is you would have to open up the document and examine it to determine whether or not it is a 100 percent work plan.
And I would also say, Your Honor, that you would look at the fact that on January 19, 2015, Jim Grant is telling Mr. Schmitt that he's

anticipating receiving the 100 percent work plan on January 28. So certainly the email string from Mr. Grant indicates he's anticipating receiving the 100 percent work plan.

Now, I – I can't tell you, by looking at the attachment, it says a 100 percent work plan.

THE COURT: It doesn't.

MR. PATIN: Right.

THE COURT: At least not that I see anyway.

MR. PATIN: Right. But the email string clearly indicates that he's anticipating receiving a 100 percent work plan.

(Tr. Trans. at II-13-16).

More importantly, Kirlin subsequently admitted into evidence the 100% Work Plan which plainly establishes that the attachment to the email was not that document. *See* Def's Tr. Ex. 18.

### E.      Roof Replacement by Peach State

On March 24, 2015, Peach State began installing the roof in accordance with its' submittal approved by Kirlin and pursuant to the Subcontract. As described by Peach State, the work began around 5:00 p.m. once Kirlin's representative gave Peach State permission to start. (Tr. Trans. at I-84). Johnson or Jeff Rhodes ("Rhodes"), both Kirlin employees, approved Peach State's work each day before Peach State was permitted to leave the job site. (*Id*.) In addition, Kirlin completed daily quality control reports detailing Peach State's work, adding a notation if there was any issue with the work or Peach State's employees. (Tr. Ex. 18). These daily reports were shared with Peach State.

On day one, Kirlin noted a problem with how Peach State was installing fastening patterns. (Tr. Trans. at I-86; Tr. Ex. 18 at 5). Peach State promptly corrected the issue. (*Id*.) Kirlin also informed Peach State that the screw placement was not in conformance with Peach State's submittal. Kirlin gave Peach State's on-site roofing foreman the submittal package and told him "to correct the screw fastening pattern, and here's how you do that." (Tr. Trans. at I-88). On this day, the daily quality control report noted the exchange between Kirlin and Peach State.

> [I]ssue w/ "correct screw count per sheet" "crickets were installed differently than plans" "Issued PSR a copy of Specs and DWG's" "Will discuss in more detail before work will continue with PSR."

(Tr. Ex. 18 at 1, 3, 5).

Peach State immediately corrected these errors as well. (*Id*.) After the errors were corrected, Johnson certified on the daily quality control report that "all materials and equipment used and work performed during this reporting period are in conformance with the contract plans and specifications, to the best of my knowledge, except as noted above." (*Id*. at 5).

Each day Johnson or Rhodes granted Peach State permission to start work. (Tr. Trans. at I-88). Peach State was dependent on Kirlin for authorization to access the roof. (Tr. Trans. at I-89). Each day Kirlin inspected Peach State's work on the roof and documented any issues. For example, on April 2, 2015, Peach State installed insulation and membrane on the roof. (Tr. Ex. 18 at 44). While overseeing Peach State's work, Kirlin noted that "the weather changed and a dense fog blew in. When that happened it impeded

our progress of installing the roof membrane." (*Id*. at 46-47). The moisture caused by the weather required Peach State to replace the membrane the next day, which it did.

From the beginning of the roofing installation, the Government had issues with Peach State's workmanship. For example, on April 2, 2015, Kirlin emailed photographs of the roof installation to the Government illustrating that "Corrected Screw Pattern and Cricket," "Applying Adhesive to insulation and membrane," "Seaming Joints" and "Installed Membrane."[28] (Tr. Ex. 19). On April 9, 2015, the Government emailed Kirlin identifying five problems with Peach State's work:

> As per our previous conversations and as expressed in the factory rep roofing inspection follow up meeting today, I have attached documentation that addresses our main concerns which are as follows, 1) roofing membrane should be applied with a wrinkle free application. 2) Pre Formed patches are required. 3) Any Indention over one quarter inch shall be filled or feathered. 4) Screws and Plates are being over compressed in the ISO board. 5) ISO board does not seem to be fully adhered and variances in but joint spacing.

(Tr. Ex. 21). However, Kirlin did not inform Peach State about the government's concerns as set out in the email. Instead, through its daily inspections and quality control reports, Kirlin led Peach State to believe that any issues with its work were resolved.

Although Peach State did not receive a copy of the Government's email to Kirlin, on April 14, 2015, Peach State participated in a production meeting. (Tr. Trans. at I-98-99; Tr. Ex. 22). Peach State agreed to get an inspection report from Carlisle and forward it to Kirlin as well as provide information from Carlisle regarding the wrinkles and ¼ inch

---

[28] There is no indication in the record that the Government requested photographs but Peach State was not included on the email. Thus, it appears that Peach State was unaware that Kirlin was photographing and sending the pictures to the Government.

offsets. (*Id*. at I-99; Tr. Ex. 22 at 2). Kirlin affirmatively stated that it was conducting quality control inspections on a daily basis to "insure that construction operations are being conducted in accordance with the Work Plan requirements." (Tr. Ex. 22 at 3). Again, Kirlin's actions led Peach State to believe that the Government's issues with the roof were resolved by Peach State either by its work or by providing documentation from Carlisle.

On April 17, 2015, Peach State submitted to Kirlin the inspection report from Carlisle that was referenced at the April 14 production meeting. (Tr. Ex. 23). Carlisle's Technical Assistance Report addressed insulation fastening, installation of flashing material, use of T-Joint patches and use of expansion joints. (Tr. Ex. 23).

### REPAIRS REQUIRED/DETAILS DISCUSSED

> 1.     Discussed Polyiso Insulation fastening. The fastening of the Polyiso insulation should hold a tight, secure compression to the insulation; however, the fastening of the insulation should not be tightened to the point of breaking the facer of the insulation and/or causing damage to the Polyiso insulation.

> 2.     Discussed non-supported material installed where field seams intersect the slope of the Polyiso insulation cricket. The installation of non-supported flashing material at the intersection of a field seam and cricket slope is not required by Carlisle. However, this is considered a good roofing practice to help prevent moisture entry on an area that is difficult to weld.

> 3.     Detail U-2A. Discussed using non-reinforced/field fabricated T-Joint patches. Field fabricated T-Joint patches are not acceptable for SureFlex PVC systems. When using 60-mil or 80-mil SureFlex PVC membrane, a PVC"T"-Joint Cover must be applied over all "T" Joint splice intersections. The use of Sure-Flex Non-Reinforced Flashing is not

acceptable as an overlay due to its thickness. Sure-Flex "T"-Joint is the only acceptable "T"-Joint cover permitted by Carlisle.

4.        Detail U-3A. Discussed Carlisle's Deck-To-Deck expansion joint detail. For a deck-to-deck expansion joint, Carlisle requires 2" Piranha plates and fasteners fastened a maximum 12" O.C. on both sides of the expansion joint. After expansion joint support is installed, Thermal plastic reinforced membrane shall be installed over the expansion joint support wide enough to extend at least 1.5" past the seam fastening plates in order to achieve a minimum 1.5" hot air weld.

(*Id*. at 2.)

Carlisle also attached letters about the use of epoxy on insulation plates, and the use of PVC flashing on T-joint intersections. (*Id*. at 4-5.)

After Peach State provided this information to Kirlin, Peach State treated the issues as closed because Kirlin did not request additional information or clarification from Peach State. (Tr. Trans. at I-101). Minutes from an April 30, 2015 production meeting with Kirlin and Peach State also noted that the issues were closed. (Tr. Ex. 28).

On April 27, 2015, Kirlin's project manager emailed to others at Kirlin photographs of the roof. (Tr. Ex. 24). There is no indication on the photographs or in the emails of any deficiencies with the roof. Kirlin then forwarded the photographs to the Government.[29] (Tr. Ex. 26). On April 29, 2015, Kirlin emailed the Government three photographs of the insulation installation, clearly showing a single layer of 3.5 inch insulation. (Tr. Ex. 26).

---

[29] Kirlin apparently kept a weekly photograph log of work on the roof. *See* Tr. Ex. 26. Again, there is no indication that Peach State was aware that Kirlin was photographing the roof and forwarding the pictures to the Government.

On April 30, 2015, the Government emailed Kirlin about concerns with the installation of the *roofing membrane*, specifically wrinkles and voids and inconsistencies with the ISO boards.  (Tr. Ex. 30) (emphasis added).

> As you know we have brought up our concerns regarding wrinkles and air pockets in the roofing membrane.  As per our discussion yesterday during the manufacturers inspection we were told that the wrinkles were common and would dissipate over time.  Since it is stated in your technical proposal and in the glue manufacturers specs that the membrane will be fully adhered and have a wrinkle free application, please **provide documentation** supporting this statement and clarifying that the glue is not drying or (flashing) before the membrane adheres.

(*Id.*) (emphasis added).

Kirlin did not share this email with Peach State  even though on the same day, Kirlin emailed Peach State the weekly subcontractors' meeting minutes which indicated as old business an issue with Peach State's inspection and report.  And once again, Kirlin failed to apprise Peach State of the Government's concerns with Peach State's work on the roof.  For reasons that were not explained at trial, the meeting minutes also stated that "[a]ll known **safety** deficiencies are to be corrected NLT Friday 01 May.  *No work will be allowed after that date unless deficiencies have been corrected and inspected.*"  (Tr. Ex. 28)  (emphasis added).  As evidenced by Kirlin's Daily Quality Control Reports, Peach State worked on the roof on May 1, 2015 and continued working on the roof after that date.  (Tr. Ex. 18 at 138-43, 144-49)

On May 4, 2015, the Government sent Kirlin another email about the roofing membrane.

Attached you will find photos taken today 4 May 2015 that shows roofing membrane that according to your technical plan and material submittal does not conform. The wrinkles and voids as well as the inconsistency of the ISO board application continue to be a concern. As we still have not gotten a reply to our previous RFI requesting documentation on the glue drying time, and your subs continually installing (sic) membrane in the same manner, at this point, we still have the same concerns of *compliance* we have had since the initial membrane was installed.

(*Id*.)(emphasis added)

Again, Kirlin did not send this email to Peach State. The only issue noted on Kirlin's May 4 Daily Quality Control Report was an incident with Peach State's drivers. "They were using an unapproved loading and unloading point." (*Id*. at 159). Kirlin took the corrective action of citing the drivers for safety violations, and then required all Peach State drivers to participate in a safety briefing. (*Id*.) On May 5, 2015, there was another safety issue that involved a Peach State employee "climbing down an extension ladder with a fire extinguisher." (Tr. Ex. 18 at 159, 165). Kirlin took the corrective action of instructing the employee to "not climb up and down a ladder with anything in his hand. Must maintain 3 points of contact with ladder." (*Id*). On May 9, 2015, Kirlin found deficiencies "in the insulation installation on the concrete deck about the penthouse. PSR was directed to temporarily cover the area and replace insulation tomorrow." (*Id*. at 187). On May 10, 2015, the Daily Quality Control Report indicates that Peach State "[r]emoved and replaced 7,000 sq. ft. of Membrane and ISO Insulation on Phase 5." (*Id*. at 193). Thus, when there were quality control or safety issues, Kirlin documented the issues on the Daily Quality Control Report and included in the report the corrective action issued to Peach State to

remedy the issue. When no issues were discovered during inspection, Kirlin recorded that information as "no QC deficiency (sic) were noted." (*Id*. at 193). Finally, Kirlin verified on each Daily Quality Control Report that the "report is complete and correct, and all materials and equipment used and work performed during this reporting period are in conformance with the contract plans and specifications, to the best of my knowledge, except as noted above." (*Id*. at 5, 12, 19, 26, 33, 40, 47, 54, 61, 68, 75, 82, 89, 96, 103, 110, 117, 123, 129, 135, 141, 147, 153, 159, 165, 171, 177, 183, 189, 195, 201, 207 and 212).

Thus, Kirlin was approving Peach State's work on a daily basis, and issuing corrective action instructions to Peach State and its employees when Kirlin discovered a quality control or safety issue. The quality control reports demonstrate that Peach State was responsive to and corrected any the deficiencies requested by Kirlin. The quality control reports also demonstrate that between April 2 and May 13, 2015, with Kirlin's approval, Peach State installed approximately 88,200 square feet of insulation and membrane.[30] (Tr. Ex. 18). The thickness of the insulation remained constant, and at no point during the installation of the insulation and membrane, did Kirlin or the Government question the insulation. (Tr. Trans. at I-106-107; Tr. Ex. 18). And, even though Kirlin was aware that the Government continued to have issues with Peach State's workmanship,

---

[30]The court calculated the square footage installed from Kirlin's quality control reports which noted how much insulation and membrane Peach State installed each day. (Tr. Ex. 18).

Kirlin did not share the Government's continued concerns with Peach State or request any corrective action by Peach State.

On May 13, 2015, a cast iron pipe fell through the ceiling of the building, and Kirlin implemented a safety shutdown on the roof.[31] (Tr. Trans. at I-118; Tr. Ex. 18 at 212). On May 14, 2015, Kirlin sent an email prohibiting any further work on the roof, and forbid any workers from being on site. (Tr. Ex. 33).

## F. Dispute about the Quality of the Roofing Work

Finally, on May 9, 2015, prior to the safety shutdown, Kirlin emailed Peach State a list of quality control deficiencies with the installation of the roof, and requested Peach State to notify Kirlin "when corrections have been made" even though many of the problems had already been corrected. (Tr. Ex. 31). The Quality Control Deficiency Log as it related to Peach State's work[32] described the problem, the date of the deficiency, and the date of correction. For example, on March 24, 2015, Kirlin noted incorrect cricket detail, and an incorrect amount of fasteners at the perimeter. (*Id*.) However, Kirlin also noted that these problems were corrected on April 4, 2015. (*Id*. at 2). The next deficiency listed is "[r]eplace weather damaged insulation and membrane" dated April 2, 2015. (*Id*.) This issue was corrected by April 23, 2015. (*Id*.).

---

[31]Apparently a plumbing pipe fell through the ceiling of the hospital in an area where the hospital was operating. (Tr. Trans. at I-119' Tr. Ex. 18 at 212). There is no allegation that Peach State was in any way to blame; rather, the plumbing contractor was at fault.

[32]The email and QC Deficiency Log also details issues for Hughes, the plumbing subcontractor. (Tr. Ex. 31 at 2).

The final two issues required Peach State to "[p]rovide **documentation** concerning ¼" depressions" and "concerning verbiage of "fully-adhered" & "wrinkle-free." (*Id.*) (emphasis added). Peach State understood that these two issues were closed in April when it forwarded the requested information from Carlisle to Kirlin. (Tr. Trans. at I-116). Nonetheless, on May 13, 2015, Carlisle provided to Peach State another Technical Assistance Report documenting an inspection conducted by Carlisle on the installation of the roofing membrane.[33] (Tr. Ex. 32). Carlisle noted that there were "'blisters' beneath the membrane" due to adhering the membrane "in the evening" but Carlisle confirmed that the blisters would dissipate. (*Id.* at 1). Carlisle took the position that the roof as installed was "acceptable for warranty." (*Id.*)

On May 19, 2015, Kirlin forwarded to the Government Carlisle's Inspection report dated April 29, 2015. (Tr. Ex. 27). In that report, Carlisle addressed blistering and patches on the roof.

### REPAIRS REQUIRED/DETAILS DISCUSSED

Item 1        Membrane blisters - observed some minor areas where there are adhesive blisters under the membrane - recommended waiting a week or two to see whether these areas would pull down once the adhesive solvents have dissipated. The noted areas are solvent blisters and not wrinkles due to poor workmanship during membrane installation. Will revisit the issue on the next inspection date. System appears to meet requirements of a fully-adhered design with no

---

[33] At the time of Carlisle's inspection, the project was 40% complete. (Tr. Ex. 32 at 2).

|          | areas significant enough to impact the roof performance being observed. |
|----------|--------------------------------------------------------------------------|
| Item 2   | Blow-out patches at tapered cricket step-off - PVC .080 flashing is an acceptable material for use in these areas as these patches are installed as an additional precautionary measure and are not required by the manufacturer. Carlisle also accepts the 1/2" step-off when using tapered polyisocyanurate cricket material with no requirement for additional tapered edge material. |
| Item 3   | Carlisle Pre-formed T-Patches - These are preferred for the overlay at T membrane junctures as they are 60 mils in thickness and will conform more readily to the membrane step-offs than the standard .080 PVC flashing material. It was noted that there are a couple of areas where the standard PVC flashing was used. It may be preferable to leave these in place as the remedy may be more problematic in the long run. This should be left to the discretion of the inspector at the final walk-through. |
| Item 4   | Roof to roof expansion joint detail - discussed the Carlisle expansion joint detail and the advantages of using the single-ply roof membrane to bridge the joint in lieu of a pre-manufactured expansion joint cover. This continuation of the roof membrane system allows the expansion joint detail to be covered under the Carlisle roof warranty. |

(Tr. Ex. 27 at 3-4)

## G.     The Hiring of Gary Mays and His Cursory Review Report

On May 13, 2015, the date the roofing project shut down and prior to receiving

Carlisle's April 29, 2015 Technical Assistance Report, Koczenasz, as Kirlin's senior

project manager, met with the Government to discuss the safety shutdown. (Tr. Trans. Vo.

II-111).   At that time, the Government contracting officer voiced his concerns that "he didn't believe he was getting adequate responses" to his questions about the roof.  (*Id*.) Consequently, Kirlin offered to bring in a roofing expert to "provide a report that hopefully would alleviate the government's concerns that everything was okay." (*Id*.)   At trial Koczenasz's testified that Kirlin hired Mays "to see if we could get the roof going again." (Tr. Trans. at II-112).   At this time, the work on the roof was stopped due to the safety shutdown, not due to any issue with Peach State's work.   Kirlin subsequently hired Gary Mays of Mays Consulting & Evaluation Services to inspect the roof.[34]   (*Id*. at II-112).

Without inspecting the roof and relying only on Kirlin's 100% Work Plan and Peach State's February 2015 submittal, Mays submitted a "Cursory Review and Comments to Construction Documents."[35]   (*Id*. at II-116-117; Tr. Ex. 37; Def's Ex. 30).   Mays reported to Kirlin that there was confusion and conflict in the documents regarding the wind uplift rating and the insulation.  *See* Tr. Ex. 37; Tr. Trans. I-205-207).   According to Mays, Peach State's submittal did not meet the "intent" of the project.  (Tr. Ex. 37 at 2-3, 5).   Mays also indicated that the work plan called for a "FM I-120 wind lift" but Peach State's submittal was based on a 120-mile-an-hour wind zone requirement. (Tr. Trans. at I-205).

Notwithstanding that Kirlin had drafted the Subcontract and BMH's had approved Peach State's submittal, Mays' review of the documents appears to be the first time that

---

[34]  There is also no indication that Peach State was aware that Kirlin hired Mays.

[35]  Mays' Cursory Review and Comments Report is dated May 29, 2015.

Kirlin realized that Peach State's original proposal, the Subcontract and the submittal approved by BMH were inconsistent with Kirlin's Work Plans and the Prime Contract.

On June 1, 2015, Kirlin emailed to Peach State a copy of Mays' report.[36] According to Kirlin, "[t]here are several items in question that will need to be discussed with Carlisle ensuring that the design and construction of the roofing system meets the contractual specifications." (Tr. Ex. 31 at 1). On June 2, 2015, Peach State emailed to Koczenasz "the assembly letter sent back in December"[37] and noted that Peach State was "putting more fasteners than needed at the perimeter as we are doing 24." (Def's Ex. 33 at 6) Koczenasz responded to Peach State's email by asking whether 24 fasteners met the enhanced specification. Koczenasz also asked about the wind uplifts. (*Id.* at 5) A Carlisle representative responded to Kirlin's inquiry.

> We designed this system to meet **90 lbs uplift** in the field, 150 lbs at the perimeter, and 225 lbs in the corner areas. I have run ASCE-7 2010 uplift calculations on this building which we use to determine IBC compliance. As you can see, after adjusting the wind speed calculation to **130 mph** to accommodate the new wind speed map zone for the Daleville area, and after using a safety factor of two, which is required by FM testing, the uplift pressures are well below the design parameters we used to determine spec compliance. The required fastening to meet IBC/ASCE-7 parameters would be 8 fasteners in the field, 9 fasteners at the perimeter, and 13 fasteners in the corner areas. We are at 8 fasteners in the field, 24 fasteners at the perimeter, and 32 fasteners in the corners. There was a great deal of confusion between design wind speeds and required uplift pressures when this project was bid. The bottom line is that the system as installed is more than adequate to meet

---

[36]On May 29, 2015, Peach State contacted Kirlin requesting information about when it could resume work on the roof. (Tr. Ex. 36). Kirlin responded that due to the weather forecast, it would be later in the week or the next week. (*Id.*). In light of the Mays' Report and Kirlin's subsequent interactions with Peach State, Kirlin's response to Peach State was disingenuous at best.

[37]The assembly letter was not attached to the exhibit admitted at trial.

and exceed the expected maximum uplift pressures by a safety factor of approx. 3.14 times.

(*Id*. at 5).

Kirlin then asked Peach State about whether Carlisle was responding to the requests for information related to the FM I-90 and FM I-120 wind lifts and the "insulation thickness of one board vs. two boards per Carlisle's system details, etc." (*Id*. at 4). Peach State responded as follows:

> We are 3 times more over what that wind zone requires, we are 3 times over the uplift or that zone.
>
> The iso being 3.5" is a non issue to Carlisle as it meets requirements.
>
> The adhesive we are using is exactly what was recommended, due to the timing of the project. Night work, winter work (originally job was to start in) and so on.

(*Id*. at 3-4).

Kirlin asked that Carlisle "state in the letters how we're meeting FM I-120 and that we are. Have them address the insulation and the rest of the items in the Mays letter." (*Id*. at 3). At this point, Peach State asked Kirlin about Mays' purpose in looking at the roof. "I thought the sole purpose of Mays being brought in was to address the "fully adhered." (*Id*. at 3). In this email exchange, Kirlin and Peach State acknowledge that there is a conflict in the wind uplift and wind zone specifications. (*Id*. at 2-3).

Apparently unbeknownst to Peach State, Koczenasz was forwarding Peach State's emails to Mays. (Def's Tr. Ex. 38 at 1). This is Mays' response on June 2, 2015.

Based on review of the attached Carlisle Roof Wind Uplift Calculations data sheet, **the calculations appear to be correct for 90 lb. uplift system using one (1) layer of 3.5" polyisocyanuate insulation**. However, **the construction documents required the roof system to meet an FM I-120 wind uplift rating** requirements as found in multiple locations of the construction documents.

Carlisle needs to provide a RoofNav Assembly Number that meets the specified assembly. Based on our research, this requires a minimum of 2" thickness insulation board on top of the tapered insulation system as discussed in 2.0 Roof System Insulation Requirements of my Cursory Review and Comments.

It appears to me that the Carlisle information does not consider the total assembly requirements. The first paragraph of the Carlisle data sheet states Carlisle disclaims responsibility concerning accuracy of these calculated results, the relevance of the results to the performance of the installing roofing system and the appropriate use of the program for any geographic location. A licensed engineer should verify the results.

While the wind uplift requirements are helpful during the design, the specifications (design) required that an FM I-120 system be installed. In addition, the fastening rates listed on this calculation are not referenced in ASCE7-10 and it is not clear how these fastening rates were determined.

(Def's Tr. Ex. 38) (emphasis added).

On June 5, 2015, Carlisle provided Peach State a letter stating that the roof as installed exceeds the requirements of ASCE 7-10 "Minimum Design Loads for Buildings and Other Structures." (Def's Tr. Ex. 34 at 2-3). Nonetheless, on June 8, 2015, after talking with Mays, Kirlin determined that the roof as installed did not meet its contract documents with respect to the wind uplift requirement and the insulation. (*Id*. at 1). According to Koczenasz, "[he] talked at length with our team and Mr. Mays this morning on what options we have to try to keep the roof and as previously stated, there is not a way to do

that and meet our obligations." (*Id*.). At trial, Kirlin's counsel asserted that "the government insisted that [the insulation] should be in two layers." (Tr. Trans. at I-73). However, Kirlin introduced no evidence which supports that assertion, and, of course, counsel's statements are not evidence. The court finds that Kirlin unilaterally made the decision that the roof needed to be removed and reinstalled.

Representatives from Peach State, Kirlin, Mays and Carlisle met at the job site to discuss Mays' report. (Tr. Trans. at I-210). Once on the roof, Mays "stated that the roof did not comply with the requirements of the work plan. Peach State rebutted that the work plan wasn't part of [the] contract." (*Id*.) Peach State disagreed with Mays and took the position that it was bound by the Subcontract, not by the Work Plans. In his June 18, 2015 Project Site Visit Report, Mays memorialized his conclusion about the roof.

> It is Mays Consulting's opinion that the roof system, as currently installed, does not meet the project Work Plan document requirements. Based on the non-compliant roof system installation, **we believe the only feasible remediation is to replace the installed roof system with a proper Work Plan compliant roof system**.

(Tr. Ex. 43 at 5; Def's Ex. 36 at 6) (emphasis added).

There is no indication in the record that Kirlin provided Peach State with Mays' conclusions about the roof.

On June 23, 2015, Peach State forwarded to Kirlin by email Carlisle's wind uplift calculations. (Tr. Ex. 44).

**H.     Kirlin's Subsequent Interactions with the Government and Peach State**

On June 26, 2015, Kirlin emailed the Government with an update on the roof repair.

(Tr. Ex. 45).

> I wanted to update you on the roof work and our status on starting back on the repair. [Kirlin] has given time to our roofing subcontractor for due diligence on how they will meet **the work plan** and that time has expired.[38] We will be issuing Peach State a notice to provide direction within 48 hours of receipt of that notice on how they will proceed with the work. Our direction will be based on their response **but we have other courses of action including using another company to complete the project if needed**. In essence, **this construction work schedule will be starting over** and we know time on our contract is passing daily, [Kirlin] will submit a no-cost time extension request with an updated schedule once we have a start date when work will resume.

(*Id.* at 1-2) (emphasis added).

On June 29, 2015, Peach State forwarded another letter from Carlisle to Kirlin in which Carlisle responded to concerns about the roof installation. (Tr. Ex. 46). In essence, Carlisle defended the installation with a single layer of insulation, and again offered to warrant the roof after installation was complete. (*Id.*) Carlisle also opined "that there is no reason to remove a perfectly good roof installation that meets International Building Code (IBC) and manufacturer's requirements who would be warranting the final installation." (*Id.*) Peach State maintained that the roof project was "always bid with one layer of insulation. It was contracted with one. It was submitted and approved with one." (Tr. Trans. at I-218).

---

[38] Kirlin does not explain what it means by or considered to be due diligence.

Notwithstanding Peach State's comments, on June 30, 2015, Kirlin sent Peach State a letter in which it notified Peach State that because the roof installation did not meet the work plan and the Government's Scope of Work as amended, Kirlin directed Peach State to resume work on the roof by first removing all the work already completed.[39] (Tr. Ex. 47).

> In accordance with your executed subcontract agreement (Ref.1), [Kirlin] hereby directs Peach State Roofing, Inc. (Peach State) to resume work on the above referenced project per the approved, For Construction Work Plan (Ref. 2) and other enforce construction documents.

> In order to meet this contractual requirement, the work installed by Peach State to date must be removed as it does not meet the work plan, applicable codes, or the Government Scope of Work (Ref. 3) requirements. The installed Work has also not been approved by the Government due to these same reasons.

> [Kirlin] has worked diligently with Peach State and their material supplier, Carlisle, to see if there is a way to accept the installed work as-is, but without the installation meeting the work plan requirements, no acceptance will be made. We have also employed the services of Mays Consulting, a third-party roofing inspection company, to review the installation against the work plan, contract, SOW, and other construction documents and they have determined the installed work does not meet these requirements. Their two reports are enclosed.

> [Kirlin] requests a written response within forty-eight (48) hours of receipt of this letter to state how and when Peach State will comply with this directive.

(*Id*).

---

[39] Attached to Kirlin's letter are Mays' Cursory Review letter and his Site Visit Report.

Kirlin represented to Peach State that the Government did not approve the work and the roof needed to be removed because it did not meet the work plan. Kirlin's representation about the government is not correct. There is no evidence before the court that, at this point, the Government had concluded that the roof needed to be removed. The Government had concerns about the membrane blistering and with the method of fastening. However, Kirlin made the decision to require the roof to be removed after it received Mays' report which highlighted how Kirlin had allowed Peach State to proceed with work which did not meet the requirements of the Prime contract or the work plans. Rather, based on Mays' suggestion to Kirlin that "the only feasible remediation" was to replace the entire roof, Kirlin informed the Government that it was going to remove and reinstall a new roof.

On July 1, 2015, Koczenasz emailed Peach State regarding Kirlin's June 30 demand letter.

> I'm sure your roofing expert will say everything is fine but you need to also respond to the work plan issue and other SOW items like paragraph 2.1.2 Work Plan and 2.6 Technical Criteria which leads to the continuous insulation issue that the work plan covers. Not addressing these issues will only be met with a Cure Notice.

(Def's Ex. 40 at 2).

After a series of email exchanges, Koczenasz reaffirmed that Peach State had until July 2, 2015 to respond to its June 30, 2015 letter. (*Id*.) Peach State disagreed with Kirlin that the roof needed to be replaced or that the roof as installed did not match the Subcontract or Peach State's submittal which was approved by BMH Engineering on Kirlin's behalf. (Tr. Trans. at I-218).

In response to Koczenasz's email, on July 1, 2015, acting through its attorney, Peach State responded to Kirlin's directive to remove the roof.[40] (Tr. Trans. at I-219).

> . . . Peach State disagrees with [Kirlin's] interpretation of the Contract documents and any notion that Peach State is obligated to comply with [Kirlin's] letter that purports to direct Peach State to remove the roofing system installed to-date and begin construction from the beginning. Notwithstanding the disagreement, Peach State is ready, willing, and able to recommence construction pursuant to the approved submittals. . . .

(Tr. Ex. 48).

Peach State then set forth in detail its position regarding the roof.

> Prior to beginning work on the Project, Peach State went through several states of preconstruction preparation with [Kirlin], including drafting and presenting construction proposals and submittals. . . . [Kirlin] approved the scope of work, specifications and submittals provided by Peach State. . .

> On February 18, 2015, [Kirlin] confirmed that Peach State's Submittal No. 778021 "Conforms exceptions noted to the Standards required by the Work Plan. . . . The exceptions required, among other things, for Peach State to install Carlisle Sure-Flex 80-mil PVC membrane and 3.5 inch polyiso insulation to the base layer of the roof. At that time and through the substantial completion of the construction, there was never any mention or reference by [Kirlin] that Peach State was to install the insulation in two layers, despite the fact that [Kirlin] had the ability to indicate as such on the submittals.

> Since receiving [Kirlin's] approval of the submittals, Peach State has furnished and installed the new roof in accordance with the Contract, in accordance with Peach State's approved submittals and in reliance on [Kirlin's] representation that Peach State's plans conform to the Work Plan standards. Since the very outset of Peach State's commencement of work on the Project, [Kirlin] has monitored, approved, and accepted Peach State's work and installation of the roof on a daily basis, without written complaint or interruption. . . .

---

[40] Peach State asserts that it started communicating with Kirlin through its attorney because Kirlin would not respond to communications otherwise.

In short, [Kirlin's] directive is without legal basis. [Kirlin] expressly approved Peach State's submittals and confirmed that the submittals "conforms (sic) . . . to the Standards required by the Work Plan." Peach State's construction, in turn, fully conforms to the submittals. [Kirlin] witnessed, oversaw, and approved Peach State's construction daily. [Kirlin] has no legal basis to require Peach State to remove the roof and re-install it according to standards or plans that do not form the basis of the Contract or that are contrary to the submittals that [Kirlin] expressly approved. Peach State will not be liable for, nor will it absorb, any additional costs or damages as a result of [Kirlin's] unilateral decision to require Peach State to cease work or to materially change the submittals that [Kirlin] already approved.

Please be advised that Peach State views [Kirlin's] unilateral decisions and unlawful demands in this regard to be a breach, or an anticipatory breach, of the Contract. . . . Peach State does not want to engage in expensive and lengthy litigation or an unproductive letter writing campaign. Peach State is ready, willing, and able to complete the construction of the project in accordance with the submittals that [Kirlin] approved. Alternatively, Peach State is ready, willing, and able to remove the roof and install it in the new way that [Kirlin] demands, provided that Peach State is compensated for it.

(Tr. Ex. 48).

Inconsistent with its statements to Peach State that the roof must be replaced, on July 6, 2015, Kirlin wrote to the Government, explaining some of the difficulty with the roof installation. (Tr. Ex. 50; Def's Tr. Ex. 41). Kirlin claimed at trial that this letter demonstrates that it was trying to help Peach State by getting the Government to accept the roof. In the court's view upon consideration of the surrounding facts the language of the letter belies Kirlin's position.

In the attached reports you will find Carlisle's position that the roofing installed to date meets the applicable codes and installation methods for this project. As the issuer of the 20-Year No Dollar Limit Warranty, Carlisle has the greatest liability if the roof is not installed correctly. As their letter state

they believe there are no installation problems in the newly placed roof and have not directed the roofing subcontractor to correct any issues to date.

Carlisle has run ASCE-7 2010 uplift calculations on Lyster Army Health Clinic (LAHC) to determine International Building Code (IBC) compliance. They adjusted the wind speed calculations to 130 MPH to accommodate the new wind zone for the Daleville area and after using a safety factor of two, which is required by FM testing, the uplift pressures are well below the design parameters. The required fastening to meet IBC/ASCE-7 would be 9 fasteners in the field, 9 fasteners at the perimeter, and 13 fasteners in the corner areas. The installed work has 8 fasteners in the field, 24 fasteners at the perimeter, and 32 fasteners in the corners. The manufacturer states this system as installed is more than adequate to meet and exceed the expected maximum uplift pressures by a safety factor of approximately 3.14 times.

Carlisle has also specifically inspected the adhering of the PVC membrane and determined the installation is within their specifications and acceptable. At this time, [Kirlin] will follow the position of the roofing professionals and would like to start back on the roof project with your permission. Per our discussions with Mr. Mora,[41] we will give a 72-hour notice to the facility prior to our start date and our Corporate Safety Director will be on site for the first two days of working resuming. Once this dates (sic) is established, an updated project schedule will be submitted for review and approval.

(*Id.*) (footnote added).

Kirlin's letter makes no mention of the insulation issue and fails to mention that Kirlin approved all of Peach State's work. Kirlin did not provide Peach State with a copy of this letter, and apparently did not tell Peach State that Kirlin was seeking permission for work to resume on the roof. (Tr. Trans. at I-223-224).

On July 22, 2015, Peach State's attorney again wrote to Kirlin because Kirlin had not responded to Peach State's July 1, 2015 letter. (Tr. Ex. 49). Peach State accused Kirlin

---

[41] Mora is the facility manager for Lyster Army Health Clinic.

of attempting to "delay the Project, blame Peach State for the delay and eventually attempt to shift liability to Peach State for any purported damages resulting from the delay." (*Id.*; Tr. Trans. at I-222). Although Peach State characterizes this letter as an attempt to get direction, the letter was merely a reiteration of Peach State's position that the roof met the requirements of its approved submittal and the Government's Scope of Work as amended. *See* Tr. Trans. at I-222 & Tr. Ex. 49. Unbeknownst to Kirlin, on the same day, Peach State filed suit in this court accusing Kirlin of anticipatory breach of contract and breach of contact. (Doc. # 1).

On July 23, 2015, Kirlin responded to Peach State's letters of July 1 and July 22, 2015, informing Peach State that the Government had issues with the workmanship of the roof installation. (Tr. Ex. 52). Kirlin attached a July 21, 2015 letter from the Government in which the Government contended "does not meet the requirements of the Statement of Work[42] or your approved Work Plan." (Def's Ex. 42). The letter cited eight issues with the roof.

1. Numerous wrinkles in membrane
2. ISO boards not securely fastened
3. Gaps in ISO board
4. Depth in ISO board fasteners inconsistent
5. Field cut patches used instead of manufactured patches
6. Positive drainage not achieved in numerous areas
7. Water flowing into and not over membrane joints
8. Adhesive problems

(*Id.*).

---

[42] The parties do not clarify if the "Statement of Work" is the same as the Scope of Work as amended.

According to the Government, Kirlin was "made aware of these issues from the Contracting Officer's Representative on March 27, 2015, however, to date no progress in correcting these issues has been made by Kirlin." (*Id*.) Attached to the Government's letter are several undated photographs. (*Id*.) Notably, several of the issues raised by the Government had been addressed by Peach State and Kirlin on April 9, 2015, (Tr. Ex. 21) and Peach State believed the issued were resolved at that time. The Government, however, did not believe the issues were resolved, but Kirlin did not inform Peach State of the Government's dissatisfaction. Instead, Kirlin's quality control reports coupled with its requests for documentation reasonably led Peach State to believe that their work and responses were acceptable. The Government directed Kirlin to provide a corrective action plan within fifteen days. (Def's Tr. Ex. 42).

On July 28, 2015, representatives from Peach State, Kirlin, Carlisle and the Government participated in a teleconference to discuss the roof. The Government declined to accept the work as installed due to the eight specific deficiencies listed in its July 21,2015 letter to Kirlin. The Government reiterated that

> [t]he issues include wrinkles or bubbles throughout, ISO boards not properly attached, field cut patches in lieu of factory patches, fastener depth is inconsistent and some break the ISO board surface, surface draining issues due to poor water flow, and others per the letter.

(Tr. Ex. 53 at 2; Def's Tr. Ex. 45 at 2).

But the Government did not reject the roof based on a single layer of insulation or on the wind uplift and wind zone discrepancies. (*Id*.) Peach State reiterated its position

that the work was acceptable, and that Kirlin had approved all the work. (*Id*.) Kirlin countered that Peach State is "the roofing expert[] and PSR has a responsibility to do their own quality control as well." (*Id*.) As the conference degenerated into arguments, the Government interrupted "to note that this call was a courtesy to clarify points of concern and that the points have been made and the work needs to get done." (*Id*. at 3). While Kirlin and Peach State argued about the adhesive and bubbles in the membrane, the Government did not request that the roof be removed and replaced. (*Id*.) The Government only wanted its noted deficiencies corrected in an acceptable manner.

Immediately following the conference call, Kirlin emailed Peach State a "Notice of Default" and a copy of the Government's July 21, 2015 letter and photographs. (Tr. Ex. 54). According to Kirlin, Peach State's failure to provide a Corrective Action Plan during the teleconference, coupled with its "defective work, and its failure to cure the same," constituted a default under Article 15 of the Subcontract. (*Id*. at 2). Kirlin demanded Peach State "cure its default" within 48 hours of receipt of the Notice. (*Id*.)

Peach State promptly responded to Kirlin's Notice of Default by first noting that its forty-eight hour notice to cure was inconsistent with its demand that Peach State provide a Corrective Action Plan by August 2, 2015. (Tr. Ex. 55). Peach State agreed to repair any "legitimate issues" with the roof but contended that Kirlin had failed to notify it of the issues in a timely manner. (*Id*.). Peach State denied that it was in default. Nonetheless, Peach State addressed each issue and requested permission to meet with Kirlin on site to identify and address each issue. (*Id*. at 2-3).

The next day, on July 31, 22015, Kirlin and Peach State met on the roof to identify the Government's problem areas. (Tr. Trans. at I-234-235) Kirlin was unable to specifically identify any areas with problems with wrinkling or fasteners. (*Id*. at I-235). But at the end of the meeting, Peach State agreed to create a corrective action plan.[43] (*Id*. at I-236). Kirlin then emailed to the Government its Corrective Action Plan. (Def's Ex. 48). According to Kirlin, the wrinkles would be repaired, "a few boards need to have a fastener installed," "a few" insulation joints would have insulation foam sprayed in gaps, fasteners not within manufacturer's requirements would be removed and replaced, and other areas would be repaired. (*Id*. at 2-3). In addition, Kirlin noted that "[t]he current system which is being installed complies with the R-20 requirement with one-layer of insulation and meets the 120 MPH wind zone for the area. (*Id*. at 3). Peach State interpreted Kirlin's letter as an acceptance of their work. (Tr. Trans. at I-240).

While negotiating with Peach State to repair the roof, sometime during the last week in July, Kirlin met with representatives from TeamCraft Roofing to discuss TeamCraft removing the current roof and replacing it using two layers of insulation and a fully-adhered PVC membrane. (Tr. Ex. 63). It is undisputed that Peach State was unaware that Kirlin was seeking to replace it as the roofing subcontractor.

On August 4, 2015, Kirlin held a subcontractor production meeting, (Tr. Ex. 58), but Peach State did not participate in this meeting.[44] (Tr. Trans. at I-241). During the

---

[43] It is not at all clear what the Corrective Action Plan would entail but Peach State was not proposing to remove the roof and start over.

[44] Neither party gave any reason why Peach State did not participate in the production meeting.

meeting, Kirlin noted that Peach State had provided a corrective action plan on July 31, 2015, and Kirlin was "waiting on direction from" the Government. (Tr. Ex. 58 at 2). In addition, Kirlin acknowledged that it was "accepting new bids for moving forward with the Roof Replacement Project." (*Id*.)

On August 6, 2015, Kirlin held another production meeting which also did not include Peach State. (Tr. Ex. 60) At that time, Kirlin indicated that during the July 28 teleconference, it was "determined that work would be replaced and done as per the work (sic). Kirlin Builders has sent a 48 hr notice to PSR to comply."[45] (*Id*.) In addition, Kirlin noted that it "will appoint a new roofing subcontractor to restart the roof replacement project." (*Id*.) Mora, the Facility Manager participated in the production meeting, and a copy of the production meeting minutes was forwarded to the Government. (*Id*. at 1-2) Again, Kirlin did not notify Peach State of its decision to replace it as the roofing contractor.

On August 11, 2015, Peach State requested permission to begin repairing the roof, but Kirlin denied permission allegedly because the Government had not yet responded to Peach State's corrective action plan. (Tr. Ex. 61 at 1). Peach State could not begin repairs until Kirlin granted permission, and at no time did Kirlin authorize Peach State to begin repairing the roof.

---

[45] It appears clear that at this time Peach State was unaware that Kirlin had determined that the only acceptable corrective action plan would be complete removal of the roof.

On August 12, 2015, Kirlin received a proposal from TeamCraft Roofing dated August 5, 2015, to replace the existing roof and replace it using two layers of insulation and a fully-adhered PVC membrane. (Tr. Ex. 63). TeamCraft Roofing expressed concern about the wind zones design, the use of water-based adhesives in cold weather, and the possibility of blistering. (*Id*. at 2). To Kirlin's undoubted dismay, TeamCraft Roofing's proposal exceeded Peach State's submittal by one million dollars.[46] (*Id*. at 1).

On August 17, 2015, Kirlin sent Peach State an email questioning whether Peach State was "pulling off this project" because a forklift and container were missing from the worksite. (Tr. Ex. 64). Peach State responded that the forklift remained on site and the container was erroneously removed by the container company. Peach State reiterated that the items would be needed "once [Peach State] resume[d] work, and "[o]nce all the issues have been worked out, PSR will be back onsite to resume the roof replacement project." (*Id*.; *see also* Tr. Trans. I-246). Kirlin still did not notify Peach State that it was seeking a new roofing contractor, and Peach State would be replaced. Instead, the next day, Kirlin sought bids on a proposed scope of work to replace the roof which included section 07 22 00 in the scope of work, and specifically required two layers of insulation. (Tr. Ex. 75 at 1 & 3).

On August 31, 2015, Kirlin forwarded to Peach State the Government's response to the corrective action plan submitted by Kirlin to the Government on July 31, 2015. (Tr.

---

[46] According to Kirlin Project Manager Steve McMahon "Who knew they would be 1 MIL more??" (Tr. Ex. 63).

Ex. 65).  Kirlin directed Peach State to submit "a new CAP [corrective action plan] as directed by the Government no later than close of business September 8, 2015 so that Kirlin has time to review the same before submitting it to the Government." (*Id.*).  The Government rejected every repair suggested by Peach State. (*Id.* at 2-8).  "The Government has reviewed the Corrective Action Plan regarding the subject roof project, and finds that this plan is unacceptable as submitted as it does not adequately address the corrections of the deficiencies in the workmanship and requirements of this Lyster Army Health Clinic task order." (*Id.*)

Of primary concern to the Government was the fact that the roof as currently installed was leaking and the repairs suggested by Peach State did not ameliorate that problem.  In rejecting the corrective action plan, the Government did not request or require that the roof be removed and replaced. (*Id.*)  Moreover, while the Government suggested that one cause of the water leakage might be the lack of two layers of insulation, it did not demand that Peach State install two layers of insulation. (*Id.*)  Peach State's new corrective action plan was due no later than September 8, 2017. (*Id.*; Tr. Trans. at I-248).

On September 8, 2015, Peach State responded to Kirlin's request for another corrective action plan. (Tr. Ex. 66).  Peach State contended that it had "substantially complied with the contract during its installation of the roof," and was "entitled to be paid by Kirlin for the work performed up to this point." (*Id.*)  Peach State did not submit a new corrective action plan but instead insisted that it was "ready, willing and able to submit a change order" to install "a roof different than the one agreed to and approved by Kirlin,"

provided that Kirlin paid in full what Peach State was owed and assured Peach State that it would be paid for any additional work. (*Id.*)

On September 14, 2015, upon receipt of Peach State's September 8 letter, Kirlin informed the Government that Peach State had declined to provide another corrective action plan in response to the Government's August 28 letter. (Tr. Ex. 67). Kirlin specifically asked the Government to "confirm direction to replace the roof in order to meet the scope of work." (Tr. Ex. 67). This request is interesting because up to this point, the Government had not directed Kirlin to remove the roof. Rather, the evidence shows that Kirlin unilaterally made the decision in June to replace the roof. On September 17, 2015, the Government directed Kirlin "to meet the specifications of the Statement of Work as awarded." (Tr. Ex. 68). Kirlin had ten days to submit a corrective action plan. (*Id.*) Kirlin was warned that if its plan was "determined to be unacceptable, Termination for Default proceedings may ensue." (*Id.*)

On September 18, 2015, Kirlin notified North American Specialty Insurance Company, Peach State's bonding company, of a potential default and claim pursuant to the performance bond.

> Pursuant to Section 3.1 of the performance bond, Kirlin (the Owner) provides notice to Peach State and North American Specialty Insurance that Kirlin is considering declaring a contractor default. Kirlin is not requesting a conference among the owner, contractor and surety to discuss the contractor's performance.

> Kirlin contends that Peach State is in default for failing to provide an acceptable Corrective Action Plan ("CAP") for deficiencies in the roof installed by Peach State on the above referenced contract.

(Tr. Ex. 69).

According to Kirlin, Peach State was also in default for failing to pay Roofers Mart, a supplier of roofing material. (*Id.*)

By this time, communications between Peach State and Kirlin had deteriorated to the point that the companies were communicating only through their lawyers. On September 23, 2015, Peach State's attorney notified Kirlin's attorney that Peach State had concerns about third-party roofing contractors having access to the roof. (Tr. Ex. 70).

> It has recently come to Peach State's attention that over the past several weeks Kirlin has requested and allowed third-party roofing contractors to conduct core samples on the Fort Rucker roof and then patch the cored areas with similar material. . . . Please be aware that Peach State will not be held responsible for the work performed by third parties, for any repair or remediation work performed as a result of the core sampling, and/or for any costs associated with the workmanship of the third-parties. Peach State considers Kirlin's request and approval of third party contractors to perform work on the Fort Rucker roof, when it has a contract with Peach State, to be in further breach of its agreement with Peach State.

(*Id.*)

On September 23, 2015, Kirlin held a production meeting without Peach State's presence or participation. (Tr. Ex. 71). At that time, Kirlin noted that Peach State's September 8 response was not a corrective action plan, and that Peach State had "not agreed to remove and replace the work in place, therefore, it [did] not conform to the expected Task Award." (*Id.* at 2). Kirlin further noted that it was "reviewing interested subcontractors proposals and will be awarding the project within a week in order to comply with the [Government's] Directive." (*Id.*)

On September 25, 2015, Kirlin submitted its corrective action plan to the Government in which it proposed "removing and replacing the existing roof to include roofing work performed under the task order to date." (Tr. Ex. 72). Kirlin also notified the Government that it would be replacing Peach State Roofing as the subcontractor. (*Id*.) Peach State did not receive a copy of this letter. (*Id*. at 2).

On October 2, 2015, the Government accepted Kirlin's September 25 corrective action plan. (Tr. Ex. 73). Peach State was not provided a copy of the Government's acceptance. (*Id*.)

On October 13, 2015, Kirlin held a production meeting without Peach State's presence or participation. (Tr. Ex. 74). Notes of the meeting indicate that Peach State "has been notified [of the Government's acceptance of Kirlin's corrective action plan] and **upon refusal to agree to perform the SOW per contract documents**, [Kirlin] will elect to issue a Letter of Default and proceed with another roofing subcontractor." (*Id*. at 2) (emphasis added). There is no indication in the record that Kirlin informed Peach State that refusal to remove the roof would result in a Notice of Default and Peach State's removal as the roofing subcontractor.

On October 23, 2015, Kirlin contacted Peach State by email and asked that Peach State ensure that the roof was secure and watertight due to impending rains. (Tr. Ex.76). In that email, Kirlin misrepresented the status of the roof replacement project. "Peach State has an obligation to maintain the Roof Replacement Project here at Ft. Rucker that **is still under review and on a holding pattern**." (*Id*. at 5) (emphasis added). On October 26,

2015, Kirlin reached out to Peach State with no response.  (*Id*. at 4).  On October 27, 2015,

Kirlin notified Peach State that the roof was failing.

> **As the Roof Replacement Project is currently in a holding pattern**, [Peach State] is still under contract to be responsible for any leaks that occur. I requested a crew last Friday to take preventative measures and again yesterday morning and have not yet been contacted with a positive response. As the rain water continues to find its way through the roof deck, ceiling tiles become damaged and will need to be replaced.  The moisture that enters the Health Clinic and absorbs into the walls and hard ceilings is a major health concern and will need to be addressed as well. . . .

(*Id*. at 4) (emphasis added).

> On October 28, 2015, Peach State responded.

> Peach State Roofing will have a man on site tomorrow (10-29-15) to investigate the roof system.  [Peach State Roofing] will inspect the work installed by [Peach State Roofing] thus far to insure water is not entering through the areas of the roof where [Peach State Roofing] has performed our work.  As you aware, Kirlin has prevented [Peach State Roofing] from working on the roof for the last several months.  Thus, any water entering the building through damage by others, existing areas of the roof in which Peach State has not yet performed work, areas that [Peach State Roofing] was not able to complete its work because of Kirlin's instruction to cease work, leaks through the old membrane currently in place and/or patches installed by others contractors will be the responsibility of [Kirlin] to repair.  Your request below does not state whether the building is leaking but to take preventative measures.  As you are aware, the existing condition of the old existing membrane is deteriorating and causing water to enter the building. [Peach State Roofing] will not be held responsible for this condition.

(*Id*. at 2).

While Peach State was communicating with Kirlin about the leaking roof, on

October 27, 2015, Peach State discovered that Kirlin had sought bids on a new Scope of

Work in August.  (Tr. Ex.75).  And, when Peach State reviewed Kirlin's August Scope of

Work, it noted that it differed significantly from the Scope of Work as amended on which Peach State had bid the previous year. (Tr. Trans. at I-258-59). For example, Kirlin included in its August Scope of Work the pertinent sections of Section 07 22 00 that delineate two layers of insulation as well as the specific wind up lift requirements. (Tr. Ex. 75).

On October 29, 2015, Peach State sent a crew to repair leaks in five areas of the roof where Peach State had done work. (Tr. Trans. at I-259). At that time, Peach State determined that there was no leaking in areas where it had performed work. (Tr. Ex. 76 at 1)

> . . . 3 locations were identified as leaking and all three areas we (sic) under existing roofing where [Peach State Roofing] had not installed any roofing. One leak was on Phase 4 near the big unit was determined to be the result of the duct wrapping and was shown to [Kirlin] . . . Not a [Peach State Roofing] roofing issue.
> In walking the roof on phase 1 some flashing appeared to have fallen from under the existing counterflashing. This membrane was tucked back under the counterflashing. No leak was ever shown in this area to [Peach State Roofing].
> Also walking around [Peach State Roofing] noticed two areas that had patches installed as preventative maintenance with seam tape but no evidence of water leakage was shown or evident.
>
> [Kirlin's] note of 5 areas of leaks where [Peach State Roofing] had performed work was not accurate as due to the above reasons.

(*Id*. at 1).

Kirlin issued a termination of default letter to Peach State on November 11, 2015.

(Tr. Ex. 79)

As of this date, despite repeated opportunities, Peach State has failed and refused to cure its multiple defaults under the Subcontract Agreement. Peach State has refused to proceed with replacing the roof as required by both the Government and Kirlin, and Peach State also has failed to pay its supplier, Roofers Mart, despite acknowledging a debt owed to Roofers Mart. As a result of these defaults and Peach State's refusal to cure them, Kirlin hereby terminates the Subcontract Agreement for default. Kirlin will proceed under Article 15 of the Subcontract Agreement to procure and install a replacement roof as required by the Government. Pursuant to Article 15, Peach State will be liable for any excess re-procurement costs incurred by Kirlin, along with Kirlin's 15% administrative mark-up and Kirlin's attorney's fees and costs.

(*Id*. at 2).

Despite Kirlin's assertion that Peach State refused to cure its defaults, it is undisputed that Kirlin denied Peach State to access the roof from May 13, 2015 until October 29, 2015. Peach State was only permitted on the roof in October 2015 to fix areas that were allegedly leaking. The undisputed evidence shows that the roof was not leaking in any areas where Peach State had worked on the roof.

## IV. CONCLUSIONS OF LAW

The central issue in this case is whether Peach State or Kirlin breached the Subcontract. The Subcontract contains a valid choice of law provision that requires this court to apply Maryland law to the issues before it.

Under Maryland law, a court must "give force and effect to the words of the contract without regard to what the parties to the contract meant or what they intended it to mean." *Hashmi v. Bennett*, 416 Md. 707, 7 A.3d 1059, 1068 (Md. 2010) (internal citation and quotation marks omitted). In other words, the court interprets a contract by determining "from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Id*. (internal citation and quotation marks omitted).

*JJK Group, Inc. v. VW Intern., Inc.* 2015 WL 1459841 (D.Ct. Md. Mar. 27, 2015). It is within these parameters that the court addresses the parties' claims.

### A.    The Parties' Contentions

At trial, Peach State contended that Kirlin materially and wrongfully breached the Subcontract in the following ways:

- by terminating Peach State[47]

- by hindering Peach State's ability to fulfill the terms of the Subcontract;

- by refusing to pay for work already completed; and

- by misrepresenting material facts about the status of the project.

Peach State further asserts that Kirlin breached the implied covenant of good faith and fair dealing required by Maryland law, and wrongfully terminated it when it decided to replace Peach State as the roofing contractor.

Peach State also contended at trial that Kirlin wrongfully terminated the Subcontract when it failed to provide adequate notice and opportunity to cure as required by the Subcontract. Peach State asserted that Kirlin's notice of default[48] failed to adequately identify the work that needed correction, failed to provide Peach State its right to a reasonable opportunity to cure any alleged deficiencies, and never gave Peach State notice and/or an opportunity to cure any alleged default relating to the payment to Roofer's Mart.

---

[47] Although Peach State asserted that Kirlin had anticipatorily breached the contract, the evidence presented at trial focused on Kirlin's material and wrongful breach of the Subcontract.

[48] Peach State does not clearly identify which notice of default it is complaining about. The court concludes that which notice of default is immaterial because the court concludes that Kirlin breached the contract in June 2015 and had no intention of allowing Peach State to cure any deficiencies.

As a result of Kirlin's breaches, Peach State contends that it is entitled to a damages award against Kirlin which would include payment of outstanding invoices, lost profits and costs, attorneys' fees, and all additional costs and expenses resulting from the removal of the on-site materials and the replacement cost of any materials caused by Kirlin as well as all other costs incurred by Peach State relating to the roofing project.

Kirlin denies that it breached the Subcontract in any manner. Instead, Kirlin asserts that Peach State breached the Subcontract in September 2015 when it refused to provide a corrective action plan or repair the roof in accordance with the directives of the Government. Kirlin contends that Peach State's refusal to proceed with removing and replacing the roof in September constituted a material breach of the subcontract that justified Peach State's termination from the project. Relying specifically on Peach State's letter of September 8, 2015, Kirlin contends that Peach State's demand for payment constituted an anticipatory repudiation by Peach State that justified Kirlin's termination of the Subcontract. Kirlin also argues that because Peach State was obligated under the Subcontract's flow down provision to Kirlin in the same manner in which Kirlin was obligated to the Government, Peach State can be liable for a breach of the Prime Contract.

In response to Kirlin's claim of breach of contract, Peach State denies that it anticipatorily breached the contract. Peach State contends that it repeatedly stressed that it was "ready, willing and able" to perform the work but that Kirlin refused permission. Finally, Peach State also contends that Kirlin waived any right to recover damages for work

on the roof under the theory that Kirlin approved Peach State's submittal and accepted Peach State's work on a daily basis.

The Subcontract indeed does contain a flow down provision that obligated Peach State to Kirlin "in the same way [Kirlin] is [obligated] to the [Government]." However, the Subcontract also contains an important exception provision[49] which provides that "[e]xcept that this Subcontract shall govern any inconsistent provision in the Contract Documents." (Tr. Ex. 7 ). Moreover, the flow down provision will not bear the weight Kirlin places on it. As the court has already laboriously noted, there are material conflicts between the Subcontract and the other documents. Acceptance of Kirlin's flow down argument effectively would nullify the Subcontract. The court concludes therefore that the Subcontract is the governing document in this case, and any claims between Peach State and Kirlin turn on the Subcontract, not the Prime Contract.

**B. Peach State's claims of anticipatory breach, breach of contract, and wrongful termination of contract (Counts I & II).**

> To state a claim for breach of contract under Maryland law, a plaintiff must "allege 'with certainty and definiteness facts showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by the defendant.'" *Yousef v. Trustbank Sav., F.S.B.,* 81 Md. App. 527, 568 A.2d 1134, 1137 (Md.Ct.Spec.App. 1990) (quoting *Continental Masonry Co. v. Verdel Constr. Co.*, 279 Md. 476, 369A.2d 566, 569 (Md.1977)). Under Maryland law, every contract includes an implied covenant of good faith and fair dealing that requires the parties to "refrain from doing anything that will have the effect of frustrating the right of the other party to receive the fruits of the contract between them." *Questar*

---

[49] Secondary to its breach of contract claim is Kirlin's position that the Subcontract's flow down provision incorporates the dispute resolution clause of the Prime Contract into Peach State's subcontract thereby requiring Peach State to resolve its disagreements with Kirlin through the process outlined therein. The court pretermits discussion of this issue because the court concludes that Kirlin materially breached the Subcontract.

*Builders, Inc. v. CB Flooring, LLC,* 410 Md.241, 978 A.2d 651, 675 (Md. 2009); *see Blondell v. Littlepage,* 413 Md. 96, 991 A.2d 80, 90-91 (Md. 2010); *Automatic Laundry Servs., Inc. v. Demas*, 216 Md. 544, 141 A.2d 497, 501-02 (Md. 1958). "'Subterfuges and evasions violate the obligation of good faith in performance,'" *Electr. Store, Inc. v. Cellco P'ship*., 127 Md.App. 385, 732 A.2d 980, 989 (Md.Ct.Spec.App.1999) (quoting Restatement (Second) of Contracts, § 205 comment d). However, Maryland "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing; the allegations making up such a claim should be pursued under a plaintiff's breach of contract claim." *Magnetti v.Univ. of Md.*, 171 Md. App. 279, 909 A.2d 1101, 1105 n.3 (Md.Ct.Spec.App. 2006). A claim for breach of the covenant of good faith and fair dealing is "merely part of an action for breach of contract." *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F.Supp.2d 785, 794 (D.Md. 2002).

*E. Const. & Elec., Inc. v Universe Techs., Inc*., 2011 WL 53185, 4 (D.N.J. Jan. 6, 2011) (No. CIV.10-1238 RMK KMW).

There is no dispute that Peach State and Kirlin owed contractual duties to each other pursuant to the Subcontract, but the fundamental issue before the court is whether either party or both breached the Subcontract, and if so, when the breach occurred. Turning first to Peach State's claim that Kirlin breached the Subcontract, the court concludes that Kirlin materially breached the terms of the Subcontract when it hindered Peach State from completing work on the roof by withholding critical information and actively misleading Peach State. Kirlin's conduct towards Peach State violated its implied covenant to work in good faith with Peach State.

The parties do not dispute that the contract documents required Government acceptance of Peach State's work. (Tr. Trans. II-18). It is also undisputed that as early as March 27, 2015, the Government expressed concern to Kirlin about Peach State's work,

but Kirlin did not timely notify Peach State of the Government's concerns with Peach State's workmanship.  Because Kirlin was the Prime Contractor on the roofing project, the Government would deal exclusively with Kirlin.  Peach State was prohibited by the Subcontract from communicating directly with the Government. Kirlin's quality control and project manager approved and continued to approve Peach State's work from March 24 until May 13, 2015, when work ceased through no fault of Peach State.  Yet, during this time period Kirlin never advised Peach State about the Government's concerns or gave Peach State an opportunity to remediate any of the problems identified by the Government.

Kirlin was required to approve Peach State's work on a daily basis, and Peach State could not leave the job site until Kirlin  inspected and signed off on the work.  Kirlin attempts to dismiss the import of the daily quality control reports arguing that they were only for the benefit of the Government. However, it is undisputed that Kirlin gave the daily reports to Peach State.  The Subcontract requires Peach State to "abide by the [Kirlin] . . . Site Specific Quality Control Plan," (Tr. Ex. 7 at 9), and the Daily Quality Control Reports clearly delineate that they are part of the Kirlin's Quality Control Plan.  (Tr. Ex. 18).  The daily quality control reports detail any issues Kirlin had with Peach State's work on the roof and include any corrective action Kirlin directed Peach State to take to remedy any perceived flaws in Peach State's work.  Thus, contrary to Kirlin's assertion that Peach State had the ultimate responsibility because it was the roofing expert, Kirlin's quality control reports show that Kirlin had ultimate authority over Peach State's work.  Moreover, every time Kirlin brought up an issue of workmanship to Peach State, Peach State immediately

corrected the problem. Kirlin's quality control reports show that issues were deemed closed after Peach State implemented Kirlin's corrective action directive. *See* Tr. Ex. 28.

Although the Government complained to Kirlin on April 30 and May 4, 2015 about the roof installation, the Government's complaints were about wrinkles in the membrane and inconsistencies in the ISO boards. (Tr. Ex. 30). The Government did not complain about insulation. On May 9, 2015, Kirlin finally emailed Peach State about some deficiencies in the roof but none of the deficiencies related to the insulation. (Tr. Ex. 31). The court concludes that Peach State installed the roof in accordance with its Subcontract and its submittal as approved by BMH Engineering on Kirlin's behalf.

In passing, Kirlin asserts that Peach State breached the Subcontract when it failed to note any deviation in its initial submittal as it was required to do by the terms of the Subcontract. According to Kirlin, because Peach State did not note deviations on its submittal, it failed to comply with the Subcontract's requirements, and thus, Peach State is ultimately responsible for any inconsistencies between the Subcontract and other documents. Kirlin's position is not well taken. Kirlin concedes that Peach State's submittal was approved by BMH as Kirlin's engineer on the project and that it did not conform to Kirlin's work plans. (Doc. # 103 at 11). In fact, BMH approved Peach State's amended submittal with the notation that it "**conformed with exceptions noted**" to the requirements of the contract. (Tr. Ex. 12 at 3) (emphasis added). The noted exceptions included 80-mil PVC membrane and a single layer of 3.50 HP-H Polyiso thermal value insulation. (*Id*. at 3 & 28). There is no dispute that Peach State was installing 80-mil PVC

membrane and 3.50" HP-H Polyiso thermal value insulation. In addition, Peach State submitted a letter from Carlisle regarding fastener patterns sufficient to meet the FM I-90 wind uplift and the 120 mph wind zone requirements.

To recap, Kirlin inspected Peach State's work on a daily basis and documented every quality control or safety issue it had with Peach State's work. Peach State corrected every deficiency as required by Kirlin. Kirlin certified each day that Peach State's work was in conformity with the contract plans and specifications and approved and signed off on Peach State's work from March 24, 2015 until the safety shut down in May, 2015. In late March and early April of 2015, the Government expressed concerns to Kirlin that the membrane application was not wrinkle free. Kirlin did not tell Peach State about these concerns. Until May 9, 2015, Kirlin, by its actions, represented to Peach State that its work was acceptable and conformed to the project's specifications and contract documents.

The Mays report highlighted the conflicts in the contractual documents related to insulation and wind lift requirements. It also demonstrates that Kirlin had failed in its responsibilities to insure that the work done by Peach State was in compliance with the Prime Contract, the Subcontract, the Government's Scope of Work as amended, and its own Work Plans. This failure, coupled with Kirlin's daily approval of Peach States' work on the roof and Kirlin's failure to timely inform Peach State about the Government's concerns, leads the court to conclude that Kirlin breached its duty of good faith through its improper administration of the contract. *See e.g., Celeron Gathering Corp. v. United States*, 34 Fed. Cl. 745 (1996) (Breach of good faith duty founded on an agency's award

of contract permitting use of wells know local authorities would not permit that use.) Every contract under Maryland law embodies an implied covenant of good faith and fair dealing that requires the parties to "refrain from doing anything that will have the effect of frustrating the right of the other party to receive the fruits of the contract between them." *Questar Builders, Inc. v. CB Flooring, LLC,* 410 Md.241, 281, 978 A.2d 651, 675 (Ct. App. Md. 2009). Kirlin's actions did not comply with the covenant.

The actions taken by Kirlin after receipt of Mays' report constitute a further breach of the implied covenant of good faith and fair dealing. Kozcenasz, as Kirlin's representative, made the unilateral decision in June 2015 that the work on the roof could not be brought into conformity with to Kirlin's Work Plan and had to be removed so a new roof could be installed. Thereafter, Kirlin represented to Peach State that it would continue as the roofing subcontractor while representing to the Government that they would be replacing Peach State as the roofing contractor. For example, on June 29, 2015, Kirlin reported to the Government that it had the option of "using another company to complete the project." (Tr. Ex. 45). But Kirlin then represented to Peach State that the installed work was not approved by the Government because the work "does not meet the work plan, applicable codes, or the Government Scope of Work." (Tr. Ex. 47). This was a misrepresentation by Kirlin. While Kirlin knew that the Government was dissatisfied with the workmanship on the roof because of blistering and wrinkles, the Government had not rejected Peach State's work for the reasons stated.

"Maryland law generally implies a covenant "to act in good faith and deal fairly with the other party or parties to a contract."  *Manning v. Mercatanti*, 898 F. Supp. 2d 850, 859 (D.Md. 2012) (quoting *Questar Builders*, 410 Md. at 273, 978 A.2d at 670.)  Even if the contract allows Kirlin some discretion, that discretion must also be exercised with good faith.  *Id*.

> [A]s a general matter, every contract contains a covenant of good faith and fair dealing, and where such a covenant is not express, it will be implied. *Clancy v. King*, 405 Md. 541, 565-66 (2008).  . . .  In *Clancy*, the Court of Appeals explained that "under the covenant of good faith and fair dealing, a party impliedly promises to refrain from doing anything that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them."  *Id*. at 570-71 (quoting *E. Shore Mkts., Inc. v. J.D. Assocs, Ltd. P'ship*, 213 F. 3d 175, 184 (4th Cir. 2000)).  Put another way, "the implied duty of good faith and fair dealing recognized in Maryland requires that one party to a contract not frustrate the other party's performance, it is not understood to impose new obligations about which the contract is silent, even if the inclusion of the obligation is thought to be logical and wise.  An implied duty is simply a recognition of conditions inherent in expressed promises."  *Blondell v. Littlepage*, 185 Md. App. 123, 148 (2009).

*Neal v. Monument Realty LLC*, 2016 WL 1733193, *10 (Ct.Spec.App. Md. Apr.26, 2016) (No. 0266 SEPT. TERM 2014), *cert. denied sub nom. Realty v. Neal*, 450 Md. 126, 146 A.3d 474 (2016).

Once Kirlin made the decision that the "only feasible remediation is to replace the installed roof system," (Tr. Ex. 43), it took action to frustrate  Peach State's ability to "receive the fruits of the contract."  On June 26, 2015, Kirlin told the Government that it was willing to replace Peach State as the roofing contractor.  (Tr. Ex. 45).  In its June 30 letter to Peach State, Kirlin told Peach State that the Government refused to accept the

work because it did not comply with the Work Plan. However, at that point in time, the Government had not refused to accept the work, nor had the Government directed to Kirlin to remove the roof. The Government was working with Kirlin to find an acceptable solution to its problems with the roof.

Kirlin led Peach State to believe the Government's concerns in March and April about the roof were resolved. However, on July 23, 2015, Kirlin reversed course and told Peach State about the Government issues with its workmanship. Kirlin's letter of July 28, 2015 reiterates that the alleged defects in the roof were only the eight issues identified by the Government. Up to this point, at no time did Kirlin or the Government express to Peach State concerns about the single layer of insulation or the wind uplift and wind zone requirements. And, since the middle of May, Kirlin had not allowed Peach State access to the roof to deal with the problems identified by the Government.

Despite its correspondence with Peach State during this period, Kirlin was actively communicating with other roofing companies, and seeking bids to replace Peach State. (Tr. Ex. 63). Kirlin was representing to the Government, and had been for at least a month, that Peach State was going to be replaced as the roofing contractor. In addition, the scope of work for which Kirlin was seeking bids differed from the Subcontract in material ways. In fact, the replacement scope or work corresponded to Kirlin's Work Plans and its Prime Contract with the Government; it did not reflect Peach State's Scope of Work as set forth in the Subcontract.

The court finds that, by the end of July at the latest, Kirlin did not deal with Peach State in good faith. While Kirlin was telling Peach State it needed to repair the eight (8) items as noted by the Government, Kirlin actually was planning to remove the roof and replace Peach State as the roofing contractor. (Tr. Ex. 60). Although Kirlin indicated that a decision had been made in the July 28 teleconference to replace the roof, in reality, that decision was made in early June. Moreover, Kirlin did not convey that information to Peach State in June or July. At the heart of this matter is Kirlin's realization that the Subcontract that it entered into with Peach State did not conform to Kirlin's Prime Contract with the Government. Coupled with the facts that Kirlin had misled Peach State about the Government's concerns with workmanship, and had approved Peach State's work, the court finds that Kirlin's actions violated its covenant of good faith thereby breaching the Subcontract. Once Peach State was ordered off the roof in May 2015 due to an unrelated safety issue, Kirlin refused Peach State permission to return to work, clearly frustrating Peach State's ability to complete the work. Kirlin's actions prevented Peach State from being able to enjoy the fruits of the Subcontract.

During the pendency of this case, Kirlin has taken the position that Peach State's failure to provide a Corrective Action Plan in September 2015 was sufficient to justify Kirlin's actions. The court disagrees. The court finds that Kirlin breached the Subcontract in June 2015 when it discovered that Peach State's submittal which was approved by Kirlin as "conforms with exceptions," did not actually conform to Kirlin's Prime Contract with

the Government. Consequently, the court need not determine whether Peach State subsequently breached the Subcontract in September 2015.

In support of its claim that Peach State breached its contract by not installing two layers of insulation, Kirlin relies heavily on Section 07 22 00 and insists that the subcontract required two layers of insulation. Kirlin parses the documents too finely, and ignores the fact that Peach State's proposal, the Subcontract and Peach State's submittal all called for a single 3.5" layer of insulation. Moreover, Kirlin *approved* Peach State's proposal for installation of a single 3.5" layer of insulation **with exceptions noted**. Kirlin's assertion that because the construction standards referred to in the 100% work plan also contained Section 07 22 00, Peach State should have been placed on notice that the contract required two layers of insulation does not survive scrutiny. (Tr. Trans. at 60; Tr. Ex. 14). First, Kirlin itself obviously was not on notice that the project required two layers of insulation because from March to May, Kirlin approved Peach States' application of a singly layer of insulation. More importantly, the contract documents that reference Section 07 22 00 refer to the *attachment* of insulation. And as the court has already noted, Section 07 22 00 contains requirements for how insulation is to be *attached* to a roof.

Kirlin further argues that because the Scope of Work as amended designates the project at Type 3 Work Plan/Design Project, Peach State should have known additional work plan documents would be provided and should have been followed. This argument is unpersuasive. Section 2.1.2 of the Scope of Work as amended provides as follows:

2.1.2 Type 3 Work Plan/Design: The contractor shall prepare design documents to clearly describe their plan of work for completing the requirements of this project. . . .

On the other hand, Task Order No. 21 indicates that the project was a Type K Work Repair and Renovation project. (Tr. Trans. at I-67-68; Tr. Ex. 6 at 2). Regardless of the designation, the work plan/design documents were Kirlin's responsibility that related directly to Kirlin's obligations to the Government. Kirlin drafted the Subcontract; if Kirlin wanted the work plan/design documents incorporated into the Subcontract, it could have included them. Kirlin points to language in the subcontract under "Description of Work" that it asserts put Peach State on notice that it was required to roof in accordance with the 35%, 65% and 100% work plans. "All work will be conducted per work plan documents, Government scope of work and its attachments 1 & 2." (Tr. Ex. 7 at 10). The court concludes that Kirlin depends too heavily on the term "work plan documents."[50] Maryland "adhere[s] to the principle of the objective interpretation of contracts." *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (Ct. App. Md. 2006). *See also Clancy v. King*, 405 Md. 541, 557 954 A.2d 1092, 1101 (Ct. App. Md. 2008). A court

> should keep the analysis simple when the language permits: 'Where the instrument includes clear and unambiguous language of the parties' intent, we will not sail into less chartered waters to interpret what the parties thought that the agreement meant or intended to mean.'

---

[50] Much of the confusion in this case results from the inconsistent and ambiguous terms used throughout this litigation including but not limited to: submittals, bids, proposals, work plans, scope of work, design documents, roof drawings, and construction standards.

*Newell v. John Hopkins Univ.*, 215 Md. App. 217, 236, 79 A.3d 1009, 1020 (Ct. Spec. App. Md. 2013).

As the court has concluded, the language of the Subcontract governs, and the Subcontract plainly states in large, bold print that Kirlin will provide no other design documents to Peach State. (Tr. Ex. 7 at 11). The subcontract does not identify "work plans/design documents" as contract documents. (*Id*. at 2, ¶ 5-6). Peach State understood that the work plan documents consisted of the Government's Scope of Work as amended which included Task Order no. 21, and Attachments 1 & 2, and the Subcontract supports that understanding. (Tr. Trans. at I-195). The Prime Contract between the Government and Kirlin describe the work plans as "minimal design documentation required for [the Government] to monitor [Kirlin's] efforts with regard to schedules, costs, codes and standards. . . ." (Tr. Ex. 8 at 8). Even if the subcontract obligated Peach State to Kirlin in the same manner as Kirlin was obligated to the Government, the Prime Contract in no way notifies Peach State that the work plans supersede Peach State's proposal, the Subcontract and the submittal *approved by Kirlin*. The Subcontract specifically provides that it "shall govern any inconsistent provision of the Contract Documents." (Tr. Ex. 7 at 2, ¶ 8).

It was not until Kirlin realized that its Subcontract with Peach State did not conform to its Prime Contract with the Government did Kirlin raise the issue about the insulation. "Maryland law also recognizes that "the obligation to act in good faith and deal fairly prohibits a party from terminating its contract (or otherwise exercising its discretion) to 'recapture' an opportunity that it lost upon entering the contract." *CA Funds Group, Inc.*

*v. Walker & Dunlop Investment Advisory Servs., LLC*, 2016 WL 305360, *5 (N.D. Ill. 2016) (quoting *Questar*, 978 A.2d at 675).  Given Kirlin's approval of Peach State's work, it cannot now argue that Peach State's installation of one layer of insulation was a breach of its Subcontract.

As earlier explained, on July 21, 2015, the Government wrote to Kirlin stating that the roofing work did not meet contractual requirements.[51]  Kirlin sent this letter to Peach State and requested a corrective action plan.  Kirlin claims that Peach State's September 8, 2015, response was an anticipatory repudiation of the Subcontract and excuses its performance under the Subcontract.  Under Maryland law, anticipatory repudiation

> excuses one party to a contract from its performance obligations upon an unequivocal act of repudiation of the contract by the other party.  *See, e.g., Friedman v. Katzner*, 139 Md. 195, 114 A. 884, 886-87 (1921) ("[W]hen in anticipation of the time of performance one definitely and specifically refuses to do something which he is obligated to do, so that it amounts to a refusal to go on with the contract, it may be treated as a breach by anticipation, and the other party may, at his election, treat the contract as abandoned, and act accordingly.  This principle is well settled. . . ."); *C.W. Blomquist & Co. v. Capital Area Realty Investors*, 270 Md. 486, 311 A.2d 787 (1973) (stating that  a breach may be anticipatory in nature if, prior to the time of performance, one definitely and specifically refuses to do something which it is obligated to do).

*Choice Hotels Intern., Inc. v. Madison Three, Inc.*, 83 F.Supp.2d 602, 608 (D. Md. 2000).

First, the court concludes that Peach State's September 8, 2015 letter does not constitute anticipatory repudiation.  Although Peach State contends that its September 8, 2015 letter

---

[51] The deficiencies noted by the government were 1. Numerous wrinkles in membrane, 2. ISO boards not securely fastened, 3. Gaps in ISO board, 4. Depth in ISO board fasteners inconsistent, 5. Field cut patches used instead of manufactured patches, 6. Positive drainage not achieved in numerous areas, 7. Water flowing into and not over membrane joints, and 8. Adhesive problems.

constituted a corrective action plan, it was not. (Tr. Trans. at I-252). Regardless of whether Peach State agreed with the Government about the quality of the work or the effectiveness of the corrective action plan already presented, when the Government rejected the August 28, 2015, plan, Peach State did not act properly when it simply did nothing after sending the September 8 letter and did not provide another corrective action plan. (Tr. Ex. 67).

Nonetheless, the court cannot conclude that Peach State's September 8 letter was "definite, specific, positive, and unconditional" "conduct inconsistent with an intent to be bound." *Altmayer-Pizzorno v. L-Soft Intern., Inc.* 302 F. App'x 148, 153 (4th Cir. 2008). "In order to constitute an anticipatory breach of contract, there must be a definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives." *Harrell v. Sea Colony, Inc.*, 35 Md.App. 300, 306, 370 A.2d 119, 123 (Ct. Spec. App. Md.1977) (citing Corbin, Contracts, s 973). In its letter, Peach State stated that it was "ready, willing and able to submit a change order" to install "a roof different than the one agreed to and approved by Kirlin." Regardless of the myriad interpretations that might be placed on this statement, it cannot be construed as an unequivocal statement not to be bound.

More importantly, however, the court has already concluded that Kirlin breached the Subcontract long before Peach State's September 8, 2015, letter. Once Kirlin breached the contract, Peach State was no longer bound by it. Under Maryland Law, a material breach of the contract by Kirlin excused Peach State from further performance.

Accordingly, the court concludes that judgment is due to be entered in favor of Peach State on its breach of contract and wrongful termination claims, and against Kirlin.

### C. Kirlin's Counterclaim against Peach State and North America Specialty

In light of the court's conclusions regarding Peach State's breach of contract claims, the court turns to Kirlin's counterclaim against Peach State and NAS. Kirlin contends that Peach State was

> obligated to perform roofing work in accordance with the "Work Plan" between [Kirlin] and Government. In addition, Peach State was obligated to diligently and continuously pursue completing its work so as to not delay, impede, obstruct, hinder, or interfere with the progress or completion of the project. . . . Peach State's refusal and/or failure to perform under the Work Plan constitutes a material breach of the Subcontract Agreement.

(Doc. # 71 at 26-27). Kirlin further contends in its counterclaim against NAS that NAS "breached its performance bond agreement as a matter of law" when Peach State failed to perform and when NAS failed to cure Peach State's default. (*Id*. at 27).

As previously stated, Peach State was not obligated to install the roof in accordance with Kirlin's work plans/design documents. Thus, Peach State did not breach the Subcontract by installing a single layer of insulation. In addition, because the court concludes that Kirlin materially breached the Subcontract by interfering with and hindering Peach State's ability to work on the roof, Peach State was no longer bound by the terms of the Subcontract. Kirlin conveniently ignores the pertinent fact that it prohibited Peach State from completing the installation of the roof. Because the court concludes that Peach

State did not materially breach the Subcontract, judgment is due to be entered in favor of Peach State and NAS and against Kirlin on Kirlin's counterclaim.

## D. Peach State's claims of Promissory Estoppel and Quantum Meruit (Counts III & IV)

In these claims, Peach State contends that because Kirlin accepted Peach State's submittal and represented that it conformed to the work plan, Kirlin is now estopped from asserting that the submittal did not conform to the task order or work plan documents. Peach State styles these counts as promissory estoppel and quantum meruit.[52] However, these counts are quasi-contractual claims. *See Ver Brycke v. Ver Byrcke*, 379 Md. 669, 693 n. 9, 843 A.2d 758, 772 n.9 (Ct.App. Md. 2004). And, "it is well accepted in Maryland that a plaintiff may not recover damages under a quasicontractual theory such as unjust enrichment or promissory estoppel if a contract governs the parties' relations." *Millennium Pharmacy Sys., LLC v. Alice Operator, LLC*, 2017 WL 1404565, at *2 (D. Md. Apr. 19, 2017) (No. CV JKB-16-3467) (quoting *Janusz v. Gilliam*, 404 Md. 524, 537, 947 A.2d 560, 568 (Ct. App. Md. 2008).

The court concludes that Peach State's quasi-contractual claims of promissory estoppel and unjust enrichment fail as a matter of law. "The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject mater on which the quasi-contractual claim rests." *Cnty Comm'rs of Caroline Cty*

---

[52] Maryland recognizes the  claim as unjust enrichment. "[U]nder Maryland law, quantum meruit is not truly a cause of action, but a *measure of recovery* available in an action for . . . unjust enrichment." *Klicos Painting Co., Inc. v. Saffo Contractors, Inc.,* 2017 WL 3976625, *5 (D. Md. Sept. 6, 2017) (Civ. No. JFM-15-02505).

*v. J. Roland Dashiell & Sons, Inc.*, 358 Md.83, 96, 747 A.2d 600, 607 (Ct. App. Md. 2000).

*See also Chevron U.S.A. Inc. v. Apex Oil Co., Inc.*, 113 F. Supp.3d 807, 822 (D. Md. 2015);

*FLF, Inc. v. World Publications, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998).

Although Peach State is not barred from pleading alternative theories, there is an express contract between Peach State and Kirlin which now governs. *See Chevron U.S.A.*, 113 F.Supp.3d at 822. In light of the court's determination that Kirlin breached the Subcontract, Peach State cannot recover under these quasi-contract theories. *See Klicos Painting Co., Inc. v. Saffo Contractors, Inc.*, 2017 WL 3976625, *5 (D. Md. Sept. 6, 2017) (Civ. Act. No. JFM-15-02505). Judgment in favor of Kirlin on these claims is due to be granted.

### E. Declaratory Relief

Peach State seeks a declaration from this Court that (1) Peach State is not obligated to pay any past, present, or future expenses or costs resulting from Kirlin's breaches and unilateral decision to halt construction on the Project and terminate Peach State, and (2) that Peach State is not responsible for any damages or delay arising out of Tecta America's work on the Project.[53] Although Peach State cites Md. Code, § 3-409 to assert that this court "may grant a declaratory judgment or decree in a civil case," this is not a separate "cause of action in Maryland but rather a type of relief." *Zayas v. Adcor Indus., Inc.*, 2017

---

[53] Tecta America is the subcontractor hired by Kirlin after Kirlin terminated Peach State. Peach State understands that Tecta America's work has not been approved by the Government and the Government has recently issued a "Cure Notice/Show Cause Notice" to Kirlin on the Project.

WL 4296721, *7 (D.Md. Sept. 26, 2017) (Case No. GJH-16-03193). Judgment in favor of

Kirlin on this claim is due to be granted.

**F. Count IX – Suppression, Deceit, Concealment of Material Facts**

By asserting a claim for "Suppression, Deceit, Concealment of Material Facts,"

Peach State conflates "two similar, yet distinct, claims sounding in fraud." *Bourgeois v.*

*Live Nation Entertainment, Inc.*, 3 F. Supp.3d 423, 459 (D. Md. 2014).

> Fraud based on active suppression of material facts is the variety of fraud referred to as "fraudulent concealment." The Maryland Court of Appeals has said: "Fraudulent Concealment 'is any statement or other conduct which prevents another from acquiring knowledge of a fact, such as diverting the attention of a prospective buyer from a defect which otherwise, he would have observed.'" *Lloyd*, 397 Md. at 138, 916, A.2d at 274 (citations omitted). In other words, it describes a "situation where the defendant actively undertakes conduct or utters statements designed to, or that would, divert attention away from" a material fact. *Id*. at 138 n. 11, 916 A.2d at 274 n. 11.

> "'To create a cause of action, concealment must have been intentional and effective – the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact. The affirmative suppression of the truth must have been with intent to deceive.'" *Fegeas, supra*, 218 Md. at 476-77, 147 A.2d at 225-26 (citation omitted). . . .

> On the other hand, a claim of deceit by nondisclosure "requires only that the defendant remain silent about, or omit facts." *Lloyd*, 397 Md. at 138 n. 11, 916 A.2d at 274n.11. A claim for deceit by nondisclosure will only lie if "the defendant had a duty to disclose." *Id*. Maryland courts have formulated the elements of the cause of action as follows:

>> "(1) [T]he defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment."

*Id.* at 459.  *See also Green v. H & R Block, Inc.*, 355 Md.488, 525, 735 A.2d 1039, 1059 (Ct. App. 1999).

According to Peach State, in March 2015, Kirlin fraudulently concealed or deceived by non-disclosure the material fact that the Government had issues with Peach State's workmanship of the roof.  Peach State contends that the Government's eight issues were material and Kirlin had a duty to disclose those issues when Kirlin first received notice of them in March. Instead, Kirlin permitted Peach State to install a significant portion of the roof without notifying Peach State about the Government's ongoing concerns.[54]

Regardless of which fraud theory Peach State is attempting to travel under, the court concludes that Peach State has failed to present any evidence that Kirlin made any misrepresentations with the *deliberate* intent to deceive.  "To create a cause of action, concealment must have been intentional and effective – the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact. The affirmative suppression of the truth must have been with intent to deceive."  *Fegeas v. Sherrill*, 218 Md. 472, 476-77, 147 A.2d 223, 225-26 (Ct. App. Md. 1958).  According to Peach State, Kirlin's misrepresentations were designed to "induce Peach State to continue to install the roof."  (Doc. # 71 at 17).  Peach State worked on the roof from March 2015 until May 13,  2015 which a safety issue halted work on the roof.  Thus, any

---

[54]  Peach State also contends that Kirlin misrepresented material facts about the Government's issues with the roof by representing that the issues related to the insulation and wind uplift and wind zone discrepancies raised by the Mays report to induce Peach State to continue working on the roof.  At this point, all work on the roof had stopped, and Peach State has presented no evidence that any misrepresentations at this time were intentionally designed to deceive Peach State to continue work.

misrepresentations occurred in March and April when the Government first notified Kirlin of its issues with the roof. Peach State has presented no evidence that during this time, Kirlin intentionally withheld information about the Government's concerns intentionally to deceive Peach State. As the court has noted, Kirlin's failure to properly administer the contracts demonstrated a lack of good faith as a matter of law, not fact. Consequently, the court concludes that judgment in favor of Kirlin on this claim is due to be granted.

## V. CONCLUSION

Based on the court's findings of fact and conclusions of law, the court concludes that:

1.      As stated in open court, judgment as a matter of law is GRANTED in favor of BMH Engineering and against Peach State and BHM Engineering is hereby DISMISSED as a defendant in this action.

2.      Judgment will be entered in favor of Peach State and against Kirlin on Peach State's breach of contract and wrongful termination claims.

3.      Judgment will be entered in favor of Peach State and NAS and against Kirlin on Kirlin's counterclaim, and the counterclaim will be dismissed with prejudice.

4.      Judgment will be entered in favor of Kirlin and against Peach State on Peach State's claims of promissory estoppel, unjust enrichment, negligence, negligent misrepresentation, declaratory judgment, respondeat superior, and suppression, deceit, non-disclosure and concealment of material facts. These claims will be dismissed with prejudice.

The court will enter final judgment after the matter of damages is resolved. Accordingly, it is ORDERED as follows:

1.      The defendant Kirlin's motion for summary judgment (doc. # 62) be and is hereby DENIED as moot.

2.      That on or before **August 3, 2018**, counsel for the parties shall meet and confer, either in person or telephonically, to attempt to resolve the amount of damages owed to Peach State.  If an agreement cannot be reached, the parties are DIRECTED to submit briefs containing calculations of damages due Peach State on or before **August 24, 2018**.

Done this 22nd day of June, 2018.

_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE